SkeltoN, Judge,
dissenting:
I cannot agree with the decision of the majority, as I believe it is contrary to the applicable statute and regulations, as will be shown below.
*370The statute that governs this case is tbe Federal Employees Pay Act of 1945, 59 Stat. 295, 296, as amended, 68 Stat. 1109 (1954), 5 U.S.C. §911 (1964), recodified, 5 U.S.C. § 5542 (1970), which provides in pertinent part as follows:
§ 911. Payment of overtime; rates.
All hours of work officially ordered or approved in excess of forty hours in any administrative workweek * * * shall be considered to be overtime work * * *. [Emphasis supplied.]
Section 945 of the same statute provided as follows:
§ 945. Regulations.
The Civil Service Commission is authorized to issue such regulations, * * * as may be necessary for the administration of the provisions of this chapter * * *.
The Civil Service Commission, pursuant to the above statute, issued regulations which appear in Part 25 (Federal Employees’ Pay Regulations) of Title 5, Code of Federal Regulations (1961 ed.), Section 25.221, which provide in pertinent part with respect to how overtime may be authorized as follows:
o p o Hb O o & B cd o o CD to rj O S’ s? cl* C09
(a) ***
i“ri CD tO .a o Ct- * Hj C*-3* so Ó4 d § 2-1 § P ^ p & . P § ^ 3-3 § g-g O ^3 Mg o a) ,ais*~N S' ® - -<=> sf. CD si's®» ^ S ® ^ "2 Qb H-11 rS
Tbe same regulation was reissued, in tbe 1964 revision of Title 5 of tbe Code of Federal Regulations, 5 C.F.R. § 550.111. Tbe opinion of tbe majority is squarely against the statute and tbe regulations, as well as the findings of tbe trial commissioner. Tbe claims of tbe plaintiffs are based on a Guard Handbook issued by tbe Public Buildings Service, Buildings Management Division of tbe General Services Administration to provide guard services for federal buildings throughout tbe country. Until it was amended in 1966, it provided that government-owned uniforms could not be worn to or from work, but bad to be left in designated locker rooms. Other rules, not in tbe handbook, provided that guns would be issued from central control points. This is basically all *371that the handbook and gun rules provided. It will be noted that there is no written order by an authorized officer of the government requiring the guards (plaintiffs) to report for duty any specified number of minutes ahead of time nor to remain on duty any period of time after work to change into and out of uniforms and to get and return their guns. In fact, the commissioner so found as follows:
72. The evidence does not establish that any written order or directive was issued by GrSA requiring the members of the guard to report for duty any specific amount of time prior to the beginning of their scheduled 8-hour shifts, nor that anyone with authority to order or approve overtime specifically ordered any of the plaintiffs to report a certain period in advance of their tours of duty; * * *.
Notwithstanding the statute and the regulations and the facts as found by the trial commissioner, the majority has awarded overtime pay to the plaintiffs for time spent in changing into and out of uniforms, and obtaining and returning guns, and walking to and and from the buildings which they were hired to guard. The majority relies on Albright v. United States, 161 Ct. Cl. 356 (1963), for this award. The court is in error in doing so, as that case actually supports the government and is against the plaintiffs in this case. In that case the guards were allowed to wear their uniforms home, so time for changing into and out of uniforms was not involved. There, a valid order had been issued in writing by an authorized official requiring the guards to report 15 minutes early to get their guns, receive special instructions and to proceed to their posts of duty. This was admitted by the government. The guards were allowed this authorized 15 minutes as overtime by the court. But the significant point in that case was the fact that the court did not allow the guards overtime pay for an additional five mimiutes of early reporting which was not specifically required by an authorized oficial. The plaintiffs here are in the same situation as the guards in Albright were in with respect to the extra five minutes time not required nor authorized by a proper officer. The plaintiffs are not entitled to recover for overtime because it was not ordered nor approved *372in writing by an officer having the necessary authority. This is not only required by the statute and the regulation, but is also in accord with the decided cases. See Bowling v. United States, 181 Ct. Cl. 968 (1967); Bilello v. United States, 174 Ct. Cl. 1253 (1966); Bantom v. United States, 165 Ct. Cl. 812 (1964), cert. denied, 379 U.S. 890; Tabbutt v. United States, 121 Ct. Cl. 495 (1952); and Albright v. United States, supra.
In Bowling v. United States, supra, this court said:
Thus, the mere fact that plaintiffs might have worked overtime during the period herein invol/ued is not determinative of their right to receive compensation therefor. “* * * the court has not given judgment under this type of overtime legislation (relating to federal employees) unless the work or activity which is the basis of the claim has been authorized, approved, ordered or confirmed by an authority empowered to do so.” Gaines v. United States, 158 Ct. Cl. 497, 501 (1962), cert. denied, 371 U.S. 936 (1964). [181 Ct. Cl. at 979.] [Emphasis supplied.]
In Albright v. United States, supra, this court held:
* * * The plaintiffs not only have the burden of proving that they were ordered to appear 20 minutes before the shift started, but also that the order was issued by one having the authority to do so. * * * [161 Ct. Cl. at 361.]
The fact that plaintiffs’ superiors knew plaintiffs were arriving early and staying late for uniform changing, drawing and returning guns, and walking to and from their posts of duty, is not enough to make the time thus spent compensable overtime. We held in Bilello v. United States, supra, that mere knowledge of overtime by an official was not sufficient to support a recovery for overtime by an employee in the absence of an order authorizing or approving overtime by an authorized official.
The guard handbook cannot be considered as written authority ordering or approving a specific amount of overtime by an authorized official. This is true for several reasons. It was a general handbook to be used throughout the United States. It did not specify any specific amount of overtime. It was more precatory or advisory than anything else. The statute contemplates a written order by an authorized official *373which provides for a specific amount of overtime. The handbook does not meet these requirements. This is obvious by the very nature of the claims here. They vary among the plaintiffs from a few minutes to two hours or more per day. It is inconceivable that the government would countenance overtime on such an indefinite and open-ended basis as the plaintiffs claim in this case. The result, for all practical purposes, is to allow each guard to figure his own overtime, without regard to any authorized written directive. Neither Congress nor the Civil Service Commission ever intended any such result.
The claims of the plaintiffs border on being frivolous. After all, a person who works for the government must do some things for himself and on his own time. When he arises in the morning, he should be willing to wash his face and teeth, comb his hair, shave, perform various other normal functions, put on his clothes, including a uniform, and a gun where required, without having the government pay him for doing it.
Furthermore, the time the plaintiffs spent in changing into and out of uniforms and getting and returning their guns appears to 'be greatly exaggerated. At oral argument, plaintiffs’ counsel said that changing into and out of uniforms consisted of taking off trousers and coat and putting on the trousers and coat of the uniform. Some of the plaintiffs testified it took them as much as 20 minutes to make this change. This is contrary to human experience. The change could logically be made in from two to three minutes — certainly no more than five minutes. In fact, the Assistant Comptroller General said in the case of Mr. Robert L. Battle, a U.S. mint guard, Cause No. B-160956, on August 15,1967 that:
* * * The administrative office estimates that the actual changing of clothes consumes about 5 minutes. * * * [T]he actual changing of clothes is estimated to consume approximately 5 minutes. Therefore, we may not give consideration to any time in excess thereof. We have considerable doubt whether the requirement of an agency of the Government that an employee change to his uniform at his place of duty constitutes the time so consumed in such changing as work. Moreover, the time spent in performing this function (five minutes) is re*374jected as de minimis. See Anderson v. Mt. Clemens Pottery Company, 328 U.S. 680, 692 (1942); Ahearn v. United States, 142 Ct. Cl. 309, 312 (1958); Bantom v. United States, 165 Ct. Cl. 312, 318 (1964).
In. the appeal of that case, the Assistant Comptroller General said in his decision of January 17,1968:
* * * [W]e cannot give consideration to more than five minutes for the time involved in changing clothes. * * *
$ $ ‡ $
* * * [W]e would still have to regard the time involved in changing in and out of uniform (approximately five minutes at the beginning and ending of a shift) as de minimis. See Plummer v. Minneapolis Line Power Implement Co., 76 F. Supp. 745; McIntyre v. Seagram & Sons, 72 F. Supp. 366.
The majority has allowed ten minutes at the beginning and ten minutes at the end of each shift, when claimed, for changing into and out of uniforms. Common experience teaches us that any able-bodied adult could make the change in from 2 to 5 minutes.
The same exaggeration exists with respect to getting a gun and returning it. The court allows up to 5 minutes at the beginning and again at the end of each shift for this. Some of the plaintiffs said it required about a minute. It was only a matter of picking up the gun or laying it on the counter. Anyone could do it in one minute or less. In Bantom v. United States, supra, the court said (at 318) it would take only 15 seconds for one man to draw his gun and ammunition. To claim overtime for this insignificant amount of time, plaintiffs proceed from the near-frivolous to the near-ridiculous. Many of the plaintiffs have increased their “gun time” by claiming they had to stand in line waiting on other guards of their shift who had arrived earlier. Time spent in waiting for an entire shift to get their guns is not com-pensable. See Bantom v. United States, supra at 318.
The trial commissioner found that the plaintiffs did not expect to be paid overtime for the uniform changing, “gun time,” and “travel time.” In this regard he found:
* * * It appears that for the most part, however, the guards accepted the fact that they had to do certain *375things without receiving overtime compensation and considered the sitaution as a fart of the job. [Finding 68.] [Emphasis supplied.]
‡ iji # %
* * * [M] embers of the guard force knew that the force’s regulations prohibiting the wearing of uniforms off Government premises was a condition of their employment, and that no additional compensation would be paid to them for time spent in changing into and out of uniforms, * * *. [Finding 73.] [Emphasis supplied.]
The majority has misinterpreted the meaning of the decision of the Comptroller General in 44 Comp. Gen. 195 (1964), by leaving the impression that he ruled that any employee who reports early to change clothes when he is not required to do so by an order requiring him to report a specific number of minutes ahead of time is entitled to overtime compensation for the early reporting. As a matter of fact, the Comptroller General ruled just the opposite. In that case the guards were required to report 15 minutes early for roll call “for the purpose of determining that sufficient staff is available to cover all posts on the ensuing shift, to make assignments to specific posts of duty, to issue special instructions or orders of the day, and to provide time for the guards to go to their assigned posts and, as necessary, relieve the outgoing shift.” [Id. at 196.] Before reporting for roll call, the guards had to obtain their revolvers from a gun case at a central location and obtain their other equipment from their lockers. The guards were paid overtime for the specified 15 minutes spent in the roll call, but were not allowed overtime for time spent in getting guns and changing clothes prior to the beginning of the required 15 minutes of early reporting.
It is significant that in that case other employees who were not guards, arrived early to change into work clothes at their lockers. The Comptroller General held that these employees were not required to report early for the purpose of changing clothes and were not entitled to overtime compensation, saying:
* * * There does not appear to be any legal requirement or justifiable legal basis for payment of overtime compensation for early reporting in their cases. * * * \Id. at 197.]
*376Thus, it appears that said decision supports the government here in its contention that no overtime compensation is due.
The changing into and out of uniforms, getting and returning guns and walking to assigned posts of duty were clearly conditions of employment. The trial commissioner so found, as pointed out above. The time spent in meeting these conditions was not compensable overtime, but was time spent in getting ready for work similar to time spent in putting on shoes or work gloves or a raincoat or an overcoat. These are some of the tasks an employee should perform for himself on his own time without expecting the government to pay him for performing them. The uniform and gun benefited the guard as much as the government, because they gave him the appearance of authority, which made his guarding job easier. The gun protected him more perhaps than the property he was employed to guard.
As a matter of fact, the plaintiffs never considered the time involved here as compensable overtime and never demanded pay for it until the Employees’ Union to which they belong instigated this suit. They are making this a test case that will affect countless thousands of government workers throughout the entire country. They are seeking back overtime pay on all of their claims except uniform changing (since 1966 they can wear their uniforms home) extending back for a period of six years prior to the filing of this suit on April 19, 1967 and up to the present time. Others can file claims with the Comptroller General extending back for 10 years in accordance with the statute of limitations governing claims filed with him. There is no way of estimating what the majority decision will cost the government.
This brings me to the question of “travel time” claimed by plaintiffs as overtime spent by them in walking to their posts of duty. This is the claim that involves the most money. We cannot overlook the fact that plaintiffs were hired to guard property — mainly buildings. Obviously, they could not guard these buildings until they arrived at the buildings. Consequently, walking to the buildings was a condition of employment that had to foe complied with before the plaintiffs *377could begin the principal activity for which they were employed. In a sense, it is no different from time spent in traveling from their homes to the place where they were to work. Without such travel they could not work. In my opinion, their work time did not start until they reached the buildings they were to guard and entered into the performance of the principal activity for which they were employed, namely guarding specified property. It follows that such walking time is not compensable overtime.
The facts show that plaintiffs received free lunch periods of 30 minutes each shift. They were subject to call during lunch periods. When their lunch was interrupted by a call, they finished their lunch when the call was disposed of. Under these circumstances, we have held that the government is entitled to offset the lunch period against any overtime. See Bowling v. United States, 181 Ct. Cl. 968 (1967); Bantom v. United States, 165 Ct. Cl. 312 (1964), cert. denied, 379 U.S. 890; and Armstrong v. United States, 144 Ct. Cl. 659 (1959), cert. denied, 361 U.S. 825. The majority agrees with this principle, but only applies it to certain designated plaintiffs. The trial commissioner indicates, with some exceptions which do not appear to be definitely proven, that the plaintiffs were able to have their free lunch period even if interrupted. Therefore, even if it be assumed, arguendo, that plaintiffs are entitled to be paid for any overtime, the lunch period should be offset against it, and this should apply to all plaintiffs, except those who can definitely prove that on a specified date they were engaged in the performance of substantial duties at lunch time and for that reason did not get the free lunch period on that particular day. Proof of habit or general course of conduct over the years would not be sufficient on this question. Specific proof would have to be made by each plaintiff as to each time he missed his lunch period because of being engaged in substantial duties.
The defendant says that the Portal-to-Portal Act of 1947, 61 Stat. 84, as amended, 80 Stat. 844 (1966), 29 U.S.C. § 216 et seq., applies to this case and bars recovery by plaintiffs. It is not clear whether or not the Act is applicable here. The majority says it does not apply and is not even relevant. However, it appears that the majority is not very sure about this, *378because it cites and quotes from the case oí Steiner v. Mitchell, 850 U.S. 247 (1956) to support the majority opinion in this case. That case involved a private employer and its employees and was decided under the provisions of the Act. If the Act is inapplicable and irrelevant to the present case, why is Steiner v. Mitchell, which was decided under the Act, applicable or even relevant here ?
Furthermore, the majority cites and quotes 29 C.F.R. § 790.7(c) (1971 ed.), being the Federal Regulations under the Act as being sufficient “to put this issue to rest.” If the Act is inapplicable and not even relevant to Federal employees, such as we have here, how could regulations under the Act put any issue to rest in the present case ?
Thus, it appears that the majority is inconsistent by saying the Act does not apply and is not relevant, and on the other hand applies a case and regulations under the Act as applicable and relevant. If the Act applies and is relevant, it should be applied all the way.
Since the majority has cited Steiner v. Mitchell, supra, decided under the Act, in support of a recovery for plaintiffs, a word should be said about that case. In the first place, the changing of clothes and showering required of employees by a 'battery company in private industry was necessary to remove acids and poisons from the 'bodies and clothes of the employees to prevent injuries to them and to their families. This was considered by the court to be a part of the process of making batteries, which was the “principal activity” for which the employees were employed. The case is clearly distinguishable from our case. Here the guards were not hired to change clothes or get guns nor to walk to their posts of duty. The uniform changing, drawing of guns, and travel time formed no part of the job they were hired to do, namely, to guard government buildings after they arrived at such buildings. In fact, in that case, Chief Justice Warren distinguished that case and the ordinary case involving clothes changing, such as we have here, when he said:
* * * Nor is the question of changing clothes and showering umder normal conditions involved because the Government concedes that these activities ordinarily constitute “preliminary” or “postliminary” activities *379excluded from compensable work time as contemplated in the Act. [Emphasis supplied.] \Id. at 249.]
This language actually supports the position of the government in this case, because we have here the changing of uniforms, etc., “under normal conditions” which is not a part of the guard duties of the plaintiffs, and are noncompensable.
It should be noted, too, that there was no back pay involved in Steiner v. Mitchell, supra. The trial court in that case said in Durkin v. Steiner, 111 F. Supp. 546, 548 (1953), which was the style of the case in that court:
Owing to the honest and justifiable difference of opinion regarding the interpretation of the law, the judgment in this case should have no retroactive effect; the liability of the defendants can hardly be said to have existed before the applicable statutes were given an authoritative interpretation, and employees who have acquiesced in the action of employers should be estopped from asserting any claims based on conduct which by silence and inaction they condoned.
In contrast, we have awarded plaintiffs back pay in our case extending back five years (1961-1966) for uniform changing and extending back six years prior to 1967 (the date suit was filed) and up to now (1972) or a total of approximately 11 years for obtaining guns and travel time. The plaintiffs seek to get around the back pay decision in the above case by saying they complained from time to time. The trial commissioner found that some of the plaintiffs complained sometimes to lower echelon personnel, but there was never any complaint to anyone who could do anything about it. This is required. See Bilello v. United States, 174 Ct. Cl. 1253 (1966). Also, the commissioner found, as pointed out above, that during the time involved here, the plaintiffs knew about performing the tasks they now complain about, and they accepted the jobs knowing they would not be paid extra for such tasks. Furthermore, they did not expect compensation for performing them.
Travel time under the Act has been held to be noncom-pensable. See Carter v. Panama Canal Co., 314 F. Supp. 386 (D.C. Cir. 1970), appeal docketed, No. 24,464, D.C. Cir., July 22, 1970; Ayres v. United States, 186 Ct. Cl. 350 (1968); *380and Ahearn v. United States, 142 Ct. Cl. 309 (1958). See also 6A BNA Lab. Rel. Rep. No. 93.211.
With further reference to the question of whether or not the Portal-to-Portal Act applies in this case, it appears that the government has the better side of the argument, especially with regard to the rationale of the Act. Its provisions state in unequivocal terms that “no employer shall be subject to any liability * * * to pay * * * an employee overtime compensation, for * * * walking, ridmg, or traveling to and from actual place of performance of the principal activity or activities which such employee is employed to perform * * * and activities which are preliminary to or postliminary to said principal activity or activities * * [Emphasis supplied.]
'Certainly, the United States is an employer. The basis of plaintiffs’ claims are “walking, riding, or traveling” and “preliminary” and “postliminary” activities. The provisions of the Act accurately describe the activities of the plaintiffs, and should by analogy bar plaintiffs’ suit even if the Act does not specifically refer to the Federal Government. If the Act had 'been written for the express purpose of covering the complaints of the plaintiffs in this case, it could not have been more complete.
Finally, even if it could be assumed, arguendo, that some of plaintiffs’ claims are compensable as overtime, the plaintiffs cannot recover because of the de minimis rule. This is especially true after allowing the free lunch period of 80 minutes per shift as an offset. The time claimed for drawing guns and changing into and out of uniforms is clearly barred by the de minimis rule, as it does not amount to over 10 or 12 minutes per shift. In McIntyre v. Joseph E. Seagram & Sons, Inc., 72 F. Supp. 366 (W.D. Ky. 1947), the court held that up to 20 minutes per day was de minimis in nature. We held in Crawford v. United States, 169 Ct. Cl. 546, 564-65 (1965), that 15 minutes per day was de minimis. See also, Ayres v. United States, supra, at 859; Bantom v. United States, supra, at 318; Baca v. United States, 450 Ct. Cl. 70, 78 (1960); Ahearn v. United States, supra, at 812; and Carter v. Panama Canal Co., supra. After allowing the 30 minute free lunch *381period as an offset, the “traveling time” is also de minimis, according to the above authorities.
I would conclude that as a matter of law the plaintiffs are not entitled to recover, and would dismiss their petition.
FINDINGS or Fact
PRELIMINARY STATEMENT
Following extensive and time-consuming informal and formal pretrial procedures, which commenced in September 1967, about a month following the date the parties joined issue, trial sessions were held in this case on J une 9,10, and 12, 1969. On June 9, 1969, the parties filed a stipulation dismissing, without prejudice, the claims of plaintiffs Lewis R. Dodds (8), J. Mills (32), and Leon White, Jr. (48); and pursuant to said stipulation and Rule 67 (since September 1, 1969, Rule 102), the petition was dismissed as to said plaintiffs, leaving 47 plaintiffs still in the case. After three of the 47 remaining plaintiffs, among other witnesses, had presented testimony, the attorneys for the parties stipulated on the record, in substance, that if the other plaintiffs were called, they would testify substantially to the same effect regarding the facts involved in this case as did the three plaintiffs who had actually testified, and that the testimony of the other plaintiffs thus would be cumulative. Relying on his understanding of said stipulation, plaintiffs’ attorney did not call any other plaintiffs to testify before closing proof.
Subsequent to the conclusion of the trial, the commissioner filed an order formally closing proof, and both parties filed requested findings of fact and objections to certain findings requested by the opposing party. Upon review of said findings of the parties, it became apparent to the commissioner that they were in basic disagreement as to the proper meaning, import, and effect of the above-mentioned stipulation, and he concluded that it would be impossible for him to prepare findings of fact, on the basis of the record as it stood at the conclusion of said trial sessions, that would do justice to both parties, absent mutual agreement and understanding-on the part of himself and the parties with respect to the *382stipulation, in question. In view of the foregoing, the commissioner held a conference, which was attended by counsel, in an unsuccessful effort to get the parties to resolve their differences over the stipulation, or to reach agreement on a course of action that might be followed in order to develop a workable record. Thereafter, on February 11, 1970, the commissioner filed a memorandum order (1) rejecting the requested findings of fact and objections thereto previously filed by 'both parties, (2) reopening proof, and (3) setting this case down for further trial.
Subsequently, on March 5, 6, 25, and 26, 1970, additional trial sessions were held. At the trial session on March 5,1970, the attorney for the plaintiffs stated on the record that he had endeavored to communicate with all the rest of the plaintiffs who had not testified and advise them to come in to do so, but that as of that time he had not been able to make arrangements for all of them to appear because some of them were deceased, or had transferred to other Government agencies and could not be located, or were in Europe; that all of the plaintiffs who actually appeared in court would be called to testify; that if by the time all available plaintiffs had testified the Government was not willing to stipulate that the remaining plaintiffs would be similarly situated, he would have to dismiss this suit as to the plaintiffs who did not present testimony. At the trial session held on March 6, plaintiffs’ attorney stated that he desired to write final letters to all the plaintiffs who had not appeared and testified, advising them to the effect that if they did not do so at the next scheduled trial session commencing on March 25, they would be nonsuited.
In a letter to the attorneys for the parties dated March 12, 1970, the commissioner reminded counsel of certain understandings reached at the conclusion of the March 6 trial session, including, among other things, that on March 25, 1970, plaintiffs would be expected to proceed without interruption until their case was completely presented, and that plaintiffs “shall undertake to dismiss the petition herein 'as to any and all plaintiffs who have not testified by the time plaintiffs close proof and rest.” A total of 33 plaintiffs testi-*383fled during the course of the trial sessions held in this case, leaving 14 plaintiffs still in the case who had not appeared and presented testimony. Before the conclusion of the final trial session held on March 26, plaintiffs’ attorney clearly indicated on the record that he had tried very hard to reach all of the 14 plaintiffs in this case who had not presented testimony and notify them that if they did not appear in court on March 26,1970, to testify in support of their overtime claims against the Government, the same would be dismissed by the court; that a letter had been sent to these 14 plaintiffs advising them to that effect, but that the letters mailed to sis of these plaintiffs had been returned to him with the envelopes stamped “Address Unknown,” and that the other eight plaintiffs out of the 14 had either not responded to his letter or shown up to testify; that, accordingly, he had called all of the plaintiffs and other persons who would testify; that plaintiffs did not have 'any other evidence to offer; and that plaintiffs rested their case. The defendant’s attorney indicated that the Government was unwilling to stipulate that the 14 plaintiffs who had not testified were “similarly situated” as the 33 who had testified and defendant did not so stipulate. Plaintiffs’ attorney then made it plain that insofar as he was concerned, the 14 plaintiffs who had not testified were “out of the case”; and that counsel had arrived at a mutually satisfactory understanding in regard to procedure under which defendant would file a motion that the petition be dismissed as to the plaintiffs who had not presented testimony, rather than the plaintiffs taking the initiative with respect to such action as previously understood and agreed would be done. The attorney for defendant tacitly confirmed that such an understanding had been reached by counsel and stated that defendant would file a motion to dismiss the petition as to the plaintiffs who did not appear and testify in support of their claims.
On May 1, 1970, pursuant to the above-mentioned understanding, defendant filed a motion to dismiss the petition as to the following-named plaintiffs who did not appear and testify: Hugh T. Brown (3), Joe Allen Brown (4), Moses Brooks, Jr. (5), Joseph O. Donley (9), Homer Ellison (10), *384Robert T. Eilertson (11), Albert T. Fells (13), Harrison W. Gabnel (16), Walter Haynes (20), Herbert A. Hoff (22), Martin S. Mitchell (31), Alexis T. Nogero (36), William B. Shephard (41), Willie C. Watson (46). Plaintiffs did not file an objection or response of any kind to defendant’s said motion to dismiss. By order of the court entered on October 2, 1970, the defendant’s said motion was “Referred to the trial commissioner for his determination and decision in his report on the merits on the whole case.” (See finding 76 containing additional details and ultimate facts found concerning the dismissal of the petition as to the above-named plaintiffs.)
In connection with the foregoing, it should be mentioned that after the commissioner closed the last trial session, and filed a second order formally and finally closing proof in this case, the parties filed new sets of requested findings of fact, objections to the findings requested by the opposing party, and briefs on the law, based on the entire record made during the trial sessions held both in Jtme 1969 and March 1970. In addition to a number of general and various other findings, plaintiffs’ requested separate findings specifically directed and limited to each of the 33 plaintiffs who appeared and testified at the trial. No findings were requested by plaintiffs with respect to any of the other 14 plaintiffs still in the case who did not present testimony and were the subject of defendant’s above-mentioned May 1, 1970 motion to dismiss.
1. Plaintiffs are citizens of the United States. During all or some portion of the 6-year period prior to April 19,1967, the date on which their joint petition herein was filed, all of the plaintiffs were employed by the General Services Administration (GSA), Region 3, as civilian guards, and they served in the GSA uniformed guard force at various Government buildings or installations in or near Washington, D.C. All of the plaintiffs were classified Civil Service employees employed below grade GS-9.
2. Plaintiffs seek to recover overtime compensation for the respective periods of their employment falling within the 6 years preceding the filing of the petition in tins case, pursuant to the provision of the Federal Employees Pay Act of *3851945, 59 Stat. 295, 296, as amended, 68 Stat. 1109 (1954), 5 U.S.C. § 911 (1964) ,1 which, reads in pertinent part:
§ 911. Payment of overtime; rates.
All hours of work officially ordered or approved in excess of forty hours in any administrative workweek performed by officers and employees to whom this sub-chapter applies shall be considered to be overtime work and compensation for such overtime work, except as otherwise provided for in this chapter, shall be at the following rates:
(1) For each officer and employee whose basic compensation is at a rate which does not exceed the minimum scheduled rate of basic compensation provided for grade GS-9 in the Classification Act of 1949, as amended, the overtime hourly rate of compensation shall be an amount equal to one and one-half times the hourly rate of basic compensation of such officer or employee, and all of such amount shall be considered premium compensation. [Emphasis supplied.]
3. As the basis for their claims, plaintiffs allege in their petition, in brief, that they were regularly ordered, required, and induced by their duly authorized superiors in the GSA to report for duty each day a substantial period of time prior to the commencement of their regularly scheduled guard shifts, and to remain on duty for substantial periods of time after the end of such shifts, to perform functions necessary to, and directly connected with, their jobs. Plaintiffs have contended more specifically in this proceeding that such “functions” consisted of changing into and out of Government-furnished uniforms; making themselves neat *386and otherwise presentable before reporting for duty; drawing and turning in weapons and other equipment at designated control points; proceeding to and from locker rooms, control points, and assigned guard posts; and receiving any special instructions from the guard being relieved.
4. Defendant has not paid plaintiifs for any of the alleged overtime, and denies that plaintiifs are entitled to overtime pay for the claimed preshift and postshift activities involved, contending that plaintiifs have not shown that such activities during the period in question constituted hours of work “officially ordered or approved” within the meaning of Section 911 of the Federal Employees Pay Act of 1945, as amended, swpra. Moreover, defendant seeks to offset against any such periods of extra duty found to be officially ordered or approved, the time it alleges plaintiifs were allowed to take during their scheduled tours of duty for meals “and other free time” during which they allegedly performed no substantial duties for the Government.2 Plaintiffs deny that they wei'e regularly allowed free time for lunch and contend that defendant is not entitled to the offset it claims.
5. Pursuant to Buie 47 (c) (since September 1, 1969, Buie 131(c)), the parties, with the approval of the commissioner, agreed that the trial of this case was limited to the issues of law and fact relating to the right of the plaintiffs to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
6. The Congress charged the General Services Administration (GSA) with a number of responsibilities and duties, including the duty to protect and guard a majority of the buildings in and around Washington, D.C., which are occupied by various Federal agencies and personnel. The administrator of GSA delegated such functions to one of its *387four services, namely the Public Buildings Service (PBS), which in turn established a civilian guard force comprised of Federal employees originally organized during the claim period into a “Protection Area” (PA), later redesignated the “Central Protection Force” (CPF). As of December 14,1960, the PA was a division of the Field Office, Buildings Management Division (BMD), Begion 3. On or before August 12, 1963, the CPF was placed under the supervision of a new Protection Branch in the BMD. The PA (later renamed the CPF) was under the overall supervision of the Chief of the BMD of Begion 3. In January 1963, the PA was organized within Begion 3, and the responsibility for the CPF was assumed by said Division.
7. The principal duty of the GSA Central Protection Force is the protection of the aforesaid buildings occupied by the Federal agencies, Government personnel assigned to work in these buildings, visitors and persons having business on the premises, and Government property located thereon. The major concern of each member of the guard force is to protect the interest of the Government in buildings and on the premises to which he is assigned. The guard is required to serve as a watchman, fire fighter, and police officer; to give aid to the injured; to cope with all emergencies; to be alert in the performance of his duties at all times; and to obey the guard force regulations and instructions.
8. The Central Protection Force (CPF), as activated in 1960, had a Chief and two deputies. The Chief was in charge of the day-to-day administration, operation, and deployment of members of the guard force, which was staffed with captains, lieutenants, sergeants, and privates. The CPF was composed of three battalions divided into companies, namely: the First Battalion consisting of Companies “A”, “B”, and “C”; the Second Battalion consisting of Companies “D”, “E”, “F”, and “G”; and the Third Battalion consisting of Companies “H”, “I”, “J”, “K”, and “L”. Each of said companies was responsible for a certain group of buildings in Washington, D.C., and environs. Each company had a headquarters office in one of the buildings which the particular company was assigned to guard.
*3889. During the period involved herein the responsibilities of the three battalions within the Central Protection Force were divided as follows:
(a) The First Battalion was responsible for all GSA guard functions in the Virginia area near Washington, D.C., including such Government buildings as the Pentagon, those at and near National Airport, some located along Columbia Pike, and the ones called the Langley Group.
(b) The Second Battalion was responsible for all GSA guard functions at the State Department and Interior Department buildings, and the Navy group of buildings on Constitution Avenue, all in Washington, D.C., as well as the various monuments in the area; and Government buildings at Germantown, Maryland.
(c) The Third Battalion was responsible for all GSA guard functions at the Health, Education and Welfare Department buildings located along Independence Avenue; the buildings occupied by the Veterans Administration, Civil Service Commission, Department of Justice, National Archives, Commerce Department, Labor Department, Interstate Commerce Commission, General Accounting Office, Internal Revenue Service, Post Office Department; the Government buildings known as the Mall Group; and the National Guard Armory, all located in Washington, D.C.; and all Government buildings located at Suitland, Maryland. During the period up to June 24,1962, Company H of the Third Battalion was also responsible for guarding the Agriculture Department, but effective June 24, 1962, that responsibility was transferred to Company F of the Second Battalion.
During the claim period, there were other guard function realignments among the three said battalions, but the same are not material or relevant to the overall questions presented for valuation in this case.
10. In each guard company, the operation of each scheduled work shift was under the immediate charge of a lieutenant who directly supervised the guard sergeants and privates on his shift. The guard lieutenant in turn was under the general supervision of a guard captain who approved the *389post assignments of the guards, assured that the officers and guards under his command received proper training and job instruction, maintained discipline and morals, and was generally charged with the supervision of all guard personnel assigned to his company.
11. (a) During all periods involved in this case, the plaintiffs herein, as well as all other guards and the officers on the GSA Guard Force, operated under rules, regulations, and instructions contained in two booklets both entitled “Handbook for Guards.” These handbooks set forth detailed administrative and operating procedures governing the work activities of all GSA guards, and they were generally applicable to the guards within the Central Protection Force in the District of Columbia area. The particular handbook in effect at the beginning of the claim period was approved and issued on April 2, 1952, by Mr. Charles A. Peters, Director, Buildings Management Division, GSA Public Buildings Service. That handbook was subsequently revised and reissued on August 12, 1963, by the head of the GSA Public Buildings Service, Office of Buildings Management. The latter issue continued in effect throughout the remainder of the claim period.3 It appears that the “Buildings Management Division” and the “Office of Buildings Management” were actually one and the same unit, the description thereof simply having been changed sometime between 1952 and 1963; that this unit was in the Central Office of the Public Buildings Service; that sometime prior to 1961, said unit was reorganized and regional offices established; that after such reorganization, Mr. Peters remained in the Central Office. In 1961, Mr. Charles C. Castella was appointed Chief, Buildings Management Division, Eegion 3 (in which region the Government buildings involved herein were located); and he remained in that position until his retirement in August 1966.
(b) The Handbook for Guards issued on April 2, 1952, contains an opening statement by Mr. Peters, which precedes *390the Foreword, Index, and Sections of the regulations and instructions, and reads in part:
All members of the guard force must observe these regulations and instructions with full consciousness that they are literally the foundation of the guard force, and that as they are followed and obeyed, so will the efficiency and reputation of the guard force be established. _
_ It would be impossible for a handbook to include instructions to cover all the situations which might arise in all locations. For this reason some of the instructions are quite general. Where the handbook is not specific as to how a case should be handled, detailed instructions are issued by the regional offices. It is the guard’s responsibility to find out from his supervisor, or some other responsible authority, just what the local instructions are. In all cases which have been covered by appropriate civil service or administrative regulations, they shall govern.
Paragraph 1 of Part I of the handbook issued in 1963 reads as follows:
1. APPLICABILITY. This handbook is the official GrSA guard training text and shall be used as the basis for on-the-job, classroom, or followup programs developed in the regions. The regulations contained herein set forth the administrative and operating procedures governing the activities of all guards and guard supervisors. It shall be the duty of each guard to become familiar with and follow the rules and regulations prescribed in this handbook.
12. (a) Pursuant to the regulations covering the subjects of Hours of Duty and Duty Schedules contained in both issues of the Handbook for Guards, plaintiffs normally worked a 40-hour week consisting of five 8-hour tours or shifts of duty during all periods involved in this case; and the hours of duty for each relief were normally scheduled as follows:
First relief — 12 pan. to 8 a.m.;
Second relief — 8 a.m. to 4 pan.; and
Third relief- — 4 p.m. to 12 p.m.
(b) Under the regulations, the hours of duty for each relief could be prescribed otherwise and modified to meet the specific protection requirements of each facility. In this connection, it should be mentioned that the testimony indi*391cates that at least some of the guard supervisory and officer personnel, including some of the plaintiffs, worked part of the time during the claim period on scheduled shifts which sometimes commenced and ended at times ranging from 15 minutes to 1 hour before the scheduled shifts of the guards who were privates.
13. (a) Subsection 206(B) of the 1952 Handbook appearing under the heading “Hours of duty” reads:
(B) Guards must report to their assigned posts in uniform, in time to relieve the guards whose tours of duty are just ending. Since guarding requires around-the-clock service, a guard who is to be relieved by another must stay at his post until his relief arrives. [See (d), m/m.]
(b) Subsection 206(C) of the same Handbook appearing under the same heading mentioned in (a), above, reads:
(C) Guard officers are expected to come on duty in sufficient time before their relief starts to inspect the guards of the relief, make any necessary reassignments of duty, and carry out special orders. [See (d), m/m.]
(c) Section 216 of the same Handbook, captioned “Tardiness,” reads:
Guards must be ready to enter on duty promptly at the beginning of their shift. Tardiness, except that resulting from emergencies beyond their control, cannot be overlooked. Disciplinary action will be taken for unexcused tardiness. [See (e),m/m.]
(d) An unsigned document directed to “GSA GUARDS” by Begion 3 of GSA under date of April 20,1960, apparently supplementing and emphasizing some of the regulations set forth in the 1952 Handbook, reads in part:
HOURS ON DUTY — * * * Since guarding requires around-the-clock service, a Guard who is to be relieved by another must stay at his post until his relief arrives. He should report to his assigned post a few minutes early in order to familiarize him [sic] with the Special Orders applicable to the post and receive from the Guard being relieved any special instructions that he may need to pass on.
*392TARDINESS — Guards shall report promptly for duty at the hours specified. Tardiness will not be tolerated and will subject Guards to disciplinary action.
(e) The subjects of ITOUBS OF DUTY and DUTY SCHEDULE are covered in the 1963 Handbook by paragraphs 48 and 49, respectively, thereof. Neither of these paragraphs contain the language used in subsections 206(B) of the 1952 Handbook, appearing under the heading “Hours of duty? relating to guards reporting to and remaining at their assigned posts, quoted in (a) above; or in subsection 206(C) of the last-mentioned Handbook, appearing under the same heading, relating to guard officers coming on duty before their relief starts, quoted in (b) above; or in the unnumbered paragraph headed “HOURS OF DUTY,” contained in the document dated April 20, 1960, relating to guards reporting to their assigned posts “a few minutes early” and remaining at their posts until relieved, referred to and partially quoted in (d), above.
(f) The subject of tardiness is covered in the 1963 Handbook by subparagraph 52c entitled “Tardiness,” appearing under paragraph 52, headed “ABSENCE FROM WORK.” Subparagraph 52c does not contain the same language covering the subject of tardiness used in either the first sentence of subsection 216 of the 1952 Handbook, quoted in (c), above; or in the first sentence of the unnumbered paragraph headed “TARDINESS” contained in the document dated April 20, 1960, quoted in (d), above. Subparagraph 52c simply states:
Tardiness, except for emergencies beyond his [guard’s] control, will be grounds for disciplinary action.
(g) There is no evidence that the April 20,1960 document referred to and partially quoted in (d) above, was ever specifically withdrawn or rescinded by Mr. Castella (identified in finding 11 (b), supra) or anyone else, at the time Mr. Castella became Chief, Buildings Management Division, Region 3, in 1961, or at 'any time during the period from 1961 to January 1966, when he was authorized to approve overtime for guards, or at any other time during the remainder of the claim period when Mr. Kyle was the only one who could authorize overtime for guards. (See finding 66, infra.)
*393(h) (1) Sections 210 and 211 of tlie 1952 issue of the Handbook for Guards covers the subjects of overtime and night differential, respectively, and read in pertinent part:
Sec. 210. Overtime. — If, because of an emergency or some other justifiable reason, a guard is required to work more than 40 hours in a week, he will be paid overtime. * * *
Sec. 211. Night differential. — For hours worked between 6 p.m. and 6 a.m. premium pay (10 percent), known as night differential, is paid in accordance with the Federal Employees’ Pay Act of 1945, as amended.
(2) The 1963 revision of said Handbook does not contain a separate paragraph headed “Overtime,” but this subject matter is included in paragraph 51, which concerns emergency duty, reading in pertinent part:
51. EMEEGENCY DUTY. Although the guard normally works certain regular hours, he may be called upon for emergency duties at times other than his regular duty hours. * * * Overtime payment or compensatory time off will be accorded if tins emergency duty causes him to work in excess of 40 hours during any regular workweek.
14. All members of the guard force were furnished with uniforms, caps, badges, and certain other necessary equipment, all of which items were Government property. Although the language of the regulations covering the wearing of uniforms contained in the 1952 and 1963 issues of the Handbook for Guards differs, it is undisputed that the effect of both versions was to require all guards to report to their assigned posts in the prescribed uniform, to wear the same during all duty hours, and to generally prohibit them from wearing their uniforms to and from work, or outside the limits of the official duty area, or except in the performance of duties considered official in nature. No item of issue could be worn or carried away from the duty area. Accordingly, the guards had to change into their uniforms before the beginning of their officially scheduled shifts and to remove them at the end of each shift before leaving the duty area. As indicated in n. 1, supra, the above-mentioned rule prohibiting guards from wearing their uniforms outside the duty area was changed, effective February 28, 1966, to permit the guards to wear their uniforms (without the badge and cap *394insignia) to and from work. Because of tlie rule in effect up to February 28, 1966, prohibiting the guards from wearing their uniforms to and from work, locker facilities were provided them by GSA, and they were required to use such facilities for the storage of individual uniforms and equipment. Up to the aforesaid date, the lockers were also used by the guards for the storage of their civilian clothing and other personal effects while they were on duty in uniform. It is apparent from the foregoing and the regulations and instructions referred to in finding 13 (a) to (e), inclusive, supra, that prior to February 28, 1966, plaintiffs, before reporting to their assigned posts at the beginning of their scheduled shifts, had to (among other things related to their work functions described in findings, infra) proceed to the lockers assigned to them and to change from their civilian clothing into their uniforms; and that, after the end of each scheduled shift, plaintiffs had to (among other things) proceed back to their lockers, remove their uniforms, and put their civilian clothing back on.
15. In connection with the facts relating to the guards being required to report for duty at their assigned posts in uniform, it should be noted that under the regulations contained in the guard handbooks the guards were expected to always present a trim, neat, and orderly appearance while on duty, and that, among other things, their shoes had to be shined, and all metal work be brightly polished. The same theme was emphasized in the document addressed to “GSA GUARDS” under date of April 20, 1960 (referred to in finding 13(d), supra) which states, among other things:
* * * A uniformed Guard * * * is a conspicuous figure. Fie attracts attention so much more than a person in ordinary civilian clothes. Therefore, his appearance * * * should be above reproach or the source of adverse criticism.
16. (a) Usually, the lockers provided for the use of the guards were located in rooms within the same building housing the company’s headquarters or guard office; but some lockers were located in other Government buildings situated in the surrounding area for which the company was responsible. In some cases, a guard was not assigned to duty in *395tibe same building where either his locker or company guard headquarters office was located. However, during the claim period the guard supervisors tried to assign as many guards as possible to the buildings in which their lockers were situated. While the guards were quite often rotated from building to building within the jurisdiction of a particular company on their assignments, the more senior guards were regularly assigned to duty in buildings with locker facilities.
(b) Under Section 223 of the 1952 issue of the Handbook for Guards relating to “Guard locker rooms and lockers,” each guard was required to keep his locker neat, clean, and orderly. Guard supervisors were required to make periodic inspections of all lockers in the presence of the guard. Paragraph 56 of the 1963 revision of the Handbook covering this same subject matter provides essentially the same thing, but enlarges the guard’s responsibilities with respect to the maintenance of lockers and locker rooms by going on to say in part:
* * * It is the responsibility of each guard to keep his locker and the area around it neat and clean at all times, and, in cooperation with other occupying guards, to police the room after each tour of duty. * * *
17. (a) Under the regulations in both the 1952 and 1963 issues of the Handbook for guards, revolvers were furnished to guards whose duties were such that a gun might be needed. It is undisputed that each of the plaintiffs herein was required to carry a gun in order to perform his duties. The guards were permitted to carry the guns furnished to them only when they were actually on guard duty. Rules designed to tighten the control over weapons were promulgated which resulted in the establishment of various gun “control” or “issuance” points by the guard captains. Accordingly, after changing into his uniform, a guard usually had to proceed to a designated gun control-issuance point and draw his weapon before proceeding to his assigned post; however, some guards were allowed to exchange weapons at their posts and they obtained their guns directly from the guards whom they were relieving in which case the guard going on duty did not have to spend time proceeding from his locker to a gun issuance point and drawing a weapon before going on to *396bis assigned post, or going to a gun issuance point and turning in the weapon before returning to his locker after being relieved at the end of his shift. When the guard was required to obtain his gun at a designated central gun issue point and to return the weapon thereto, the amount of time it took to obtain or to return the gun after arriving at the gun point depended upon how many, if any, other guards were already waiting to turn in their guns. Thus, the waiting time varied from none, if a guard was first in line, to several minutes if he was in a long line. The time actually required to sign for and obtain a gun, and the time to turn the weapon in, exclusive of the waiting time, if any, involved was very short. Where guns were transferred on post, it did not take an appreciable amount of time for a guard coming on shift to obtain the weapon from the guard going off duty.
(b) Each guard captain was instructed by GSA to keep the “issuance points * * * to a minimum consistent with efficient operations.” The distances between the gun issuance points and the locker rooms used by plaintiff guards varied widely. Some of these points were located right in the locker rooms, others were located in the guard offices which were situated very nearby or some distance removed, on the same or different floors of the same building housing the lockers, or in other buildings. So, in some cases the distance between the lockers and gun issuance points was quite short, and in other instances the distances were very long. Consequently, the time required for plaintiffs to go from their lockers to their designated gun issuance points varied considerably.
18. Although the wording of the regulations in the 1952 and 1963 versions of the Handbook for Guards bearing on the checking of revolvers issued to the guards differs considerably, it appears that throughout the claim period guards were under instructions to check guns issued to them at the gun issuance points or handed to them on post, out of view of the public when possible, and to advise the guard supervisor in the event a gun was considered unacceptable for any reason. However, it should be noted that with a few exceptions, the plaintiffs who obtained their guns from the guards they were relieving did not claim that they were entitled to a certain amount of overtime for checking their guns or offer *397proof that they actually spent a specific amount of time each day checking their guns. In any event, the evidence does not disclose that as a general rule the guards ever gave their weapons more than a casual look after they were issued or turned over to them.
19. A regular formal rollcall-type of inspection of the guards was not made before they assumed their assigned posts. However, the Handbook for Guards required that guards be inspected before they assumed their posts to determine whether they were correctly dressed, and it appears that this was done as a matter of general practice. After the guards had put on their uniforms, the guard supervisor on duty would personally look them over. These inspections were usually made in the guard office. However, sometimes the guards stood inspection in their locker rooms in instances where the supervisor’s locker was near the one the guards used. The supervisor just walked around and quickly checked all the guards in uniform within a very short period of time. The number of guards that stood such inspections varied with the particular shift.
20. Some of the plaintiffs in this case who testified were officers during part of the claim period. As disclosed in finding 13(b), sufra, under the regulations in the 1952 Handbook for Guards, officers were “expected” to come on duty in sufficient time to “inspect” the guards of the relief; make necessary reassignments of duty; and carry out special orders. Although the above-mentioned provision was not included in the 1963 revision of the Handbook, the officers were still “expected” during the remainder of the claim period to come on duty sufficiently early before the start of their scheduled shifts to perform said preshift functions because it would have been impossible for them to have discharged their assigned preshift responsibilities if they had not reported for duty early. Furthermore, the testimony showed that the guard officers did not “voluntarily” report for duty early in order to perform their assigned preshift functions but did so because they were required to do so by their superior officers and really had no choice in the matter. (See finding 64(d).)
21. After changing into his uniform and standing such inspection as was made by the supervisor (and also drawing *398his weapon, if he did so at a central gun point rather than obtaining a gun on post from the guard being relieved), the guard would then proceed to his assigned post. Although there is no evidence that any of the plaintiff guards were specifically “ordered” in so many words to report to his assigned post “a few minutes early,” it is apparent from the facts contained in finding 13(d), supra, that at least on one occasion each guard was instructed in writing that he “should” do so “in order to familiarize him [sic] with the Special Orders applicable to the post and receive from the guard being relieved any special instructions that he may need to pass on.” The evidence does not show that the guards viewed the above instruction as simply a statement of what their superiors considered a “desirable practice” which they would like to have the guards voluntarily follow as a matter of cooperation. On the contrary, while the evidence concerning the practice actually followed by the guards is quite limited, it appears that they reasonably understood and considered said instruction to be a command that obligated and required them to report to their assigned posts of duty a few minutes before the specified hour of their scheduled shifts; and that the practical effect and result of the instruction in question was that the guards were induced to report at their posts a little early and generally did so as a matter of normal routine; however, it is important that there is no real evidence as to how early the guards generally reported to their posts.
22. Not only were guards more or less frequently rotated from post to post within the jurisdiction of the company to which they were assigned (finding 16(a), supra), but in some instances the shortage of guard personnel created an emergency situation which resulted in guards being temporarily assigned on loan from one company to another company within a particular battalion 'and even to a company in some other battalion. As indicated in earlier findings, the number of buildings for which each guard company making up the several battalions comprising the overall guard force was responsible, the distances between the locker facilities and the gun issuance points (at which a guard was required to draw his weapon unless he was permitted to accept and *399transfer a gun on post), and the distance between the gun points and the various posts of duty (or the distance between the 'lockers and the posts in those cases where a guard proceeded directly from the locker room to his 'assigned post before obtaining a gun) varied a great deal. In some oases, the assigned posts of the guards were located in the immediate area of their locker rooms; others were located in areas adjacent to or nearby the locker rooms; some were located from one to several 'blocks away. In a few instances, a guard would even be assigned to a post miles from his assigned locker room. Sometimes, the distances involved in proceeding to a post, and/or inclement weather, made it necessary or more convenient or faster for a guard to travel to and from his post either in his own personal motor vehicle or a Government-owned vehicle. It is apparent from the foregoing that the time required for the guards to travel between their lockers and posts varied considerably from time to time, depending upon the location of the posts to which they were assigned.
23. Upon reporting to his post, a guard would familiarize himself with any special orders applicable to the post and receive from the guard being relieved any special information or instructions that the latter might need to pass on. If the guard reporting for duty had already drawn his weapon at a designated gun issuance point, he was then ready to actually take over the post. If this had not been done, the guard would obtain the gun in the possession of the guard being relieved, presumably give the weapon a quick check, and assume his duties.
24. Once a guard assumed his duties on post, he was required to stay at his post unless he was relieved, except in case of an emergency, and he was considered officially on duty even in those instances where he was relieved for rest and lunch periods. In this connection and pertinent to defendant’s contention that it is entitled to offset the amounts of time plaintiffs were allowed by defendant to spend each day resting and eating lunch against any “officially ordered and approved” amounts of overtime work that may be found to have been performed by them due to complying with official regulations necessitating certain preshift and postshift *400activities, it is important to note that Section 208 of the 1952 Handbook for Guards, headed “Lunch periods,” reads as follows:
(A) Unlike most Government employees, whose work schedule includes an extra half hour to provide SO minutes off for lunch on their own time, the guard’s lunch period is a part of his regular 8-hour tour of duty. A lunch period is granted him only as a privilege, and is available only when it does not interfere with his work. Although a 30-minute-lunch period is scheduled by the supervisor, and the guard is relieved of work during that time, he is officially on duty and subject to call.
(B) The guards in “one-man” buildings may have to eat lunch while working. In such cases the supervisor will try to regulate the patrol assignment so they can have a reasonable lunch period.
Paragraph 50 of the 1963 revision of the Handbook covering the subject of “LUNCH PERIODS” reads as follows:
A guard works a straight 8-hour tour of duty. He is authorized to eat his lunch during his tour of duty for a period not in excess of 30 minutes at a time to be determined by his supervisor. Lunch periods will be scheduled so as to least interfere with building protection requirements. During this lunch break the guard is officially on duty and subject to call.
It will be noted that the 1963 Handbook does not contain a provision similar to paragraph (B) of the 1952 Handbook (quoted herein) regarding the possibility of guards in “one-man” buildings having to eat lunch while working. However, credible testimony presented at the trial shows that a number of the plaintiff guards were assigned to one-man buildings, and that some of them were not subject to a “patrol assignment,” since they were not required to make patrols, and were simply stationed at a fixed post in the building during their entire shift.
25. Preliminary to the findings of fact, infra, it should be explained that the testimony presented at the trial regarding the subject of lunch periods and rest breaks for members of the guard force provides the basis for certain facts of a general nature applicable to the guard force as a whole. However, such facts are stated primarily for the purpose of *401indicating the many factors and circumstances involved which affected the varying situations of each individual guard, the necessity of making and considering specific find-hags relating to each plaintiff guard after looking at his testimony and evaluating the same in light of the testimony presented by both other plaintiff guards and nonplaintiff witnesses, and the difficulty encountered in making precise findings covering all possible variations in the situations actually existing with respect to each plaintiff guard at any given time. Keeping the foregoing in mind, the general facts that follow are deemed to be pertinent and helpful in considering the detailed facts set forth hereinafter relative to the lunch periods actually afforded to, and taken by, plaintiff guards:
(a) Supervisors tried to schedule a 30-minute lunch period for members of the guard force under their supervision whenever this was possible and practical, but this did not occur to a substantial degree with respect to many of the plaintiff guards who testified in this case.
(b) Speaking in general terms, guards were assigned to so-called “fixed” posts, “roving” posts, and “roving” patrols, some of which included duties at “security” posts. Each of these assignments presented different problems as to lunch and rest periods. Some guards worked all, most, or a small part of the time on day, evening, or night shifts, in the same or different buildings, during varying periods of time.
(c) A guard on duty on a weekday during a day shift in a building where a cafeteria was located and open (cafeterias were not ordinarily open on weekends, Sundays, or holidays), could eat lunch either in the cafeteria or in his locker room if at the same time and at the same building other guards or regular “relief” guards were on duty or available for relief work (this was particularly true as to guards in the State Department or Pentagon buildings); however, all guards eating either in the cafeteria or in the locker room were subject to call and interruption. Guards were permitted to eat lunch at some posts but ordinarily not on “security” posts.
(d) The general practice was to provide a relief man for the guards on a security post, but sometimes a shortage of personnel resulted in a guard on such a post not being relieved *402at all, or relieved for less than a period of 80 minutes, or at a time different from the one the guard was usually relieved.
(e) As to guards assigned to “one-man,” “fixed” posts, they were “supposed” to have a lunch period, i.e., if available a relief man was assigned to come and relieve the guard so he could eat, but many times there was a shortage of relief men and it was not possible to relieve a guard so he could eat. Guard officers sometimes relieved a guard if a relief guard was not on hand. If a guard was not relieved and he had his lunch with him, he normally had no problem in eating at his duty post, providing it was not a “security” post, but if he did not have his lunch with him or he was on a security post, he was usually unable to eat.
(f) Guards required to make regularly scheduled and roving patrols usually were given patrol schedules that enabled them to complete their patrols within 45 minutes and have a 15-minute rest break each hour of their shift during which they could eat or rest, unless interruptions due to work duties occurred. Sometimes a patrol schedule was such that a guard could complete his patrol in as little as 30 minutes and have 30 minutes to eat lunch and/or rest; however, unless actually relieved by another guard, after completing a patrol the guard usually remained at a certain designated point or area in the building, and while free to eat or rest, he was actually on duty and subject to interruptions involving official work functionsj Sometimes a guard was so occupied during the interval between scheduled patrols that he did not have time to finish eating so he had to eat part of his lunch at one time and finish it at another time.
(g) Sometimes some guards, particularly on the day and evening shifts, did not bring lunch; some did not bother to eat at all; while some simply obtained some items of food or drink at a snack bar, if one was available, and finished eating in a very short time.
(h) Some guards regularly received a full 30 minutes or some lesser period of time for lunch; some did not eat at any regular time or have a certain amount of time off to eat, and some never, or rarely, received any time off whatsoever for lunch; some sometimes received only a few minutes for lunch; some ate lunch at their posts in between performances of offi*403cial duties wbicb came up for attention more or less frequently ; and some ate lunch “on the fly” or “on the run” while making patrols or carrying out other assigned duties.
(i) According to a guard supervisor who testified at the trial, most guards normally did not complain about not being relieved, or getting time off, or being afforded an opportunity to eat lunch, because they knew it was pointless and would not do them any good to complain; however, complaints were made by some guards, particularly when they were on duty on Saturdays, Sundays, and holidays, and did not have their lunch with them, and were “stuck” in the building. Typical of the complaints periodically made by some guards was that they had to rush through their lunch, to eat too fast, and to eat on the run. Few complaints were received from guards assigned to evening and night shifts, and for the most part guards accepted lunch situations considered by them to be unsatifactory as a part of their jobs. The supervisor did not make written reports of the complaints received by him or pass such complaints on to his superiors. Upon receiving a complaint, the supervisor simply made a practice of pointing out to the complaining guard that the regulations did not “require” that guards be given a lunch period.
26. (a) At this point additional facts of a general nature are set forth concerning the postshift actions, activities, and functions which the members of the guard force were required to perform in order to comply with the GSA regulations mentioned hereinbefore. At the end of the shift, the guards who exchanged weapons on post turned their guns over to their replacements, and returned directly to their assigned lockers where they removed their uniforms and redressed in civilian clothes. Those guards who obtained their guns from designated central gun points, returned to the gun points respectively assigned to them, turned in their weapons, and then proceeded to their lockers to change back into civilian clothes.
(b) The credible testimony shows that the total time actually taken by a majority of the plaintiff guards to perform required postshift actions was less than the total time spent by them in preshift activities. One of the reasons for this time difference is that the on-coming guard had to start *404out for his post at a time that would enable 'him to report there “a few minutes early” for the purpose of familiarizing himself with any special orders applicable to the post and any instructions the guard being relieved might have to pass on before he left the post at the end of his shift. However, as explained in n. 8, mfra, none of the plaintiffs claimed compensation for a specific amount of overtime performed by him in complying with this early reporting directive.
(c) During a part of the claim period the actual practice generally followed by at least some members of the guard force was for the guard going on duty at a post to relieve the guard already there before the end of his shift so that the off-going guard would be able to return to his gun point, or directly to his locker if he had transferred his gam to the relief guard, change clothes, and leave for home at or before the hour ending the shift. In fact, a memorandum was issued in 1964, directing the guards to stop the practice of leaving for home before the end of their shifts. After this memorandum was issued, the guards could still be relieved early on post, so long as they did not leave the building in whioh they lockered until the end of their shift. The practice of “early relief” continued to some extent after the issuance of said memorandum. Thus, the total additional time the guards were at work where they followed said practice, would be spent before the beginning of the shift. There is no evidence in the record that any of the plaintiffs ever actually left for the day before the end of his scheduled shift.
27. While the evidence is unsatisfactory as to when a particular plaintiff guard shined his shoes, polished the metal work on his uniform, tidied up his locker, and stood inspections of his assigned locker, and there is no evidence showing the time necessarily and actually spent by him in such activities, it may be reasonably assumed that all plaintiff guards regularly complied with the regulations concerning these matters, either at the time they came to work or before leaving for the day, and that it took some time for them to do so. Accordingly, it is found that a reasonable estimated amount of time for these activities should be included in the total preshift and postshift activities required of each plaintiff *405guard in order for him to comply with GSA guard regulations.
28. In substance and brief summary, the evidence shows that in order for the members of the guard force, including the plaintiffs who testified in this case, to comply with directions, rules and regulations relating to preshift and postshift procedures, each guard normally and generally on each workday had to go, prior to the beginning of his scheduled shift, first to his assigned locker where he changed into his uniform, made himself presentable for inspection, and sometimes stood inspection; then, unless he obtained his gun on post, he had to proceed to a designated gun control point, variously located in the locker room, in an area adjacent or near thereto, or at a point on another floor of the same building or another building ranging from a short to a long distance away from the locker room, where he drew and signed for his weapon, and in some cases other equipment, and, if he had not already done so, to stand inspection; then he had to either walk or ride to his assigned post of duty, where he felt compelled by GSA directives and long-standing custom or practice to report “a few minutes early”, and familiarize himself with any special orders applicable to the post and any special instructions the guard being relieved had to pass on, and, if he had not already drawn his gun, to accept and check the one transferred to him by the guard going off duty. Then, after the end of his scheduled shift, each guard had to follow, with some relatively minor deviations, substantially the same procedure in reverse.
29. (a) Plaintiffs contend that it was required and necessary for them to report for duty each workday at times varying from less than one-half hour to as much as nearly an hour prior to the commencement of their respective regularly scheduled shifts of guard duty, and to remain at work for more or less similar periods of time at the end of their shifts, in order for them to comply with work rules and regulations contained in the Handbook for Guards, as well as other directives issued by GSA. An average time required each workday for the plaintiffs to comply with the regulations and alleged work “orders” is not claimed by them; rather each of the plaintiffs who testified in this case contends *406that be is entitled to compensation for different amounts of total preshift and postshift overtime assertedly required and necessarily performed by him, ranging from a low of 22 minutes in the case of one plaintiff to a high of 1 hour and 40 minutes in the case of another plaintiff. The different amounts of overtime respectively claimed by these plaintiffs is due to the fact that the factors mentioned earlier which affected the overtime situation of the guards varied from individual to individual.
(b) In view of the foregoing, it was considered essential by the parties and the commissioner that each of the 47 plaintiffs still in the case should appear and testify in support of his claim. Accordingly, as mentioned in the Preliminary Statement, supra, plaintiffs’ attorney assertedly attempted to notify all of these plaintiffs, and he was successful in contacting and having 33 of them appear and present testimony at the trial, but the other 14 plaintiffs did not do so. Each of the 33 plaintiffs (two of whom served as sergeants and officers during certain portions of their employment) presented considerable testimony concerning the time it took them to perform most of the preshift and postshift activities and functions involved in this case. However, it is highly important to mention that none of these plaintiffs (except two who, as sergeants, performed supervisory duties) testified that he actually reported to his assigned post of duty a certain number of minutes prior to the commencement of his scheduled shift to enable him to comply with the GSA “early reporting” directive (quoted in finding 13(d) and mentioned in finding 21); nor did any plaintiff (with the exceptions noted above) claim a certain amount of overtime for reporting on post early. The two plaintiffs who served as sergeants and later as officers, testified that, as officers, they did report to their assigned posts early, consistent with the provisions contained in Subsection 206(C) of the 1952 issue of the Handbook for Guards (quoted in finding 13 (b)), and instructions received from their superiors.4
*40730. (a) Understandably, tbe testimony of the plaintiffs varied considerably with respect to the amount of time it took them to travel between their lockers and gun points, and 'between the gun points and their assigned posts of duty, if they drew their weapons at such a point; and to travel between their posts and lockers, if guns were transferred on post. But what is not so understandable and is so hard to reconcile is the varying and conflicting testimony presented by some of the plaintiffs as to the amount of time it took them to perform certain other preshift and postshift activities, particularly to: (1) change from civilian clothes into their uniform and make themselves presentable for inspection; (2) change back into civilian clothes; and (3) draw and return their weapons at gun control points.
(b) As to the first of the functions mentioned in (a), above, an analysis of the testimony presented by the 33 plaintiffs concerning the time it took them on the average to change into their uniforms ranged from a low of 5 minutes to a high of 20 minutes. The time figures produced an overall average of a little over 11% minutes which is distorted on the high side by reason of the fact that the time claimed by some of the plaintiffs was far in excess of that asserted by other plaintiffs, one claiming 20 minutes, one claiming about 17 minutes, one claiming as much as 16 minutes, 10 claiming as much as 15 minutes, 15 claiming as much as 10 minutes, two claiming over 10 but less than 15 minutes, and three claiming under 10 minutes ranging from as little as 5 minutes to 7 minutes.
(c) As to the second of the functions mentioned in (a), above, the time assertedly taken by these same plaintiffs on the average to change back into their civilian clothes also ranged from a low of 5 minutes to a high of 20 minutes. The time figures produced an overall average time of about 10% minutes which, too, is a bit distorted on the high side because the average claimed by some of these plaintiffs far exceeded *408that asserted by other plaintiffs, one claiming 20 minutes, seven claiming as much as 15 minutes, one claiming 13 minutes, seven claiming as much as 10 minutes, and seven claiming under 10 minutes ranging from 5 to 8 minutes.
(d) As to the third of the functions mentioned in (a), above, 26 plaintiffs testified that they drew and returned their weapons at designated gun issue points and stated the specific time it took them to do so. The other seven plaintiffs transferred guns on post and did not claim any time for these activities. The time assertedly taken, on the average, by said 26 plaintiffs to draw their weapons ranged from a low of 1 minute to a high of from “3 to 6 minutes” (a mean time of 414 minutes), the next high being 5 minutes. The time claimed, on the average, to turn in the weapons was within the same range, i.e., 1 to 5 minutes. The time figures relating to both the drawing and turning in of weapons produced an overall average time of slightly over 3 minutes for each of these activities which is considered a bit excessive because of the wide discrepancy in the times some of the plaintiffs testified it took them to perform these activities. With respect to the time required to draw weapons, six claimed 5 minutes, one claimed between 1 to 6 minutes, one claimed between 2 to 5 minutes, eight claimed 3 minutes, three claimed between 2 to 3 minutes, one claimed 2 minutes during a part of the claim period and 3 minutes the rest of said period, three claimed 2 minutes, and three claimed 1 minute. In regard to the turning in of weapons, 22 claimed about the same amount of time as to draw them, two claimed 2 to 3 minutes less time, and two claimed 2 minutes more time.
31. (a) Upon consideration of the foregoing, and the testimony presented by all of the plaintiffs, and nonplaintiff witnesses (including, two officers on the GSA guard force, one a captain and the other an inspector), and after making allowances and adjustments in some time figures deemed incredible as being exaggerated and excessively high, it is found that the reasonable maximum average times required of the plaintiffs each workday to perform the various activities outlined in 30(b) through (d) above are as follows: 10 minutes to change from civilian clothes into their uniforms *409and make themselves presentable for duty after arriving at their lockers; 10 minutes to change back into their civilian clothes after returning to the lockers assigned to them;5 3 minutes to draw their weapons at designated issue points before reporting to assigned posts; and 3 minutes to turn in their weapons at such points after completing their shifts and returning to the gun points.6 Unless specifically found otherwise, no time is allowed to any plaintiff for the very short period it took him to obtain and return his weapon, or to check the same, at times he actually performed these actions on post, such time being generally included in that allowed each guard for travel between his locker and his post.
(b) It should be explained that since under the ground rules of the trial, each plaintiff must stand on his own proof, those plaintiffs who testified that they required as much or more than the above maximum times to either change into or out of uniform, are being allowed the maximum of 10 minutes for each of these changes; but those plaintiffs who testified that it required them less than 10 minutes to change into their uniforms, or to change into their civilian clothes, will be allowed only the highest amount of time they stated it actually took them to change into and out of their uniforms. The same is true with respect to the time required for the plaintiffs to draw and turn in their weapons at a gun issue point, i.e., those plaintiffs who testified that they required more than 3 minutes to draw or to turn in their weapons are being allowed a maximum of 3 minutes for each of these activities; those who testified that it took less than 3 *410minutes to draw or return tbeir weapons are being allowed the highest amount of time they stated it actually took them to draw and return their guns.7
(c) The other activities covered in each of these separate findings primarily involve the times required by the particular plaintiff concerned to travel between his designated locker and post of duty, either directly or via a designated gun issue point, as the case may be, both before and after his shift. In this connection, it should be mentioned that the testimony regarding such travel time stands unrebutted, defendant simply contending that the times are excessive.8 *411Therefore, to the extent the testimony of a plaintiff concerning the number of minutes he claimed it took him to perform both preshift and postshift travel stands unrebutted and is considered credible, such amounts of time will be included in the total overtime allowed the particular plaintiff. While each of the separate findings will cover the subject of lunch breaks, as related to each plaintiff’s situation, the findings in regard thereto will, in most instances, be brief since the lunch and rest period “offset” issue raised by defendant is considered to be without merit.
32. (a) Plaintiff Eugie L. Baylor, from 1962 (exact date not disclosed by the record), was continuously employed during the claim period in either Company D, E, or F of the Third Battalion, and the work performed by him while in each of these three companies was basically the same. For about 2 months in 1962, the locker assigned to him was located in the Interior Department Building, and his gun point also was in the same building but at another, separate location. Throughout this period, it took him 5 minutes to walk between his locker and gun point, both prior to the commencement and after the end of each shift.
(b) As 'best it can be determined from a confused record, during this same period of time mentioned in (a), above, Mr. Baylor was assigned on rotation to four different posts variously located at the basement garage entrance to the Interior Building, at the GSA Building, at 1724 F Street, N.W., and at the Executive Office Building. When he was assigned to both the Interior and GSA Buildings, it took him 5 minutes to walk from the gun point to his post of duty, and a similar amount of time to return from his post to the gun point. It took him 10 minutes, both prior to the commencement of his shift and at end thereof, to walk between his gun point and post when he was assigned to 1724 F Street, N.W., and 15 minutes each way for such travel when he was assigned to the Executive Office Building.
*412(c) During approximately the last 10 months of 1962, and the remainder of the claim period, Mr. Baylor’s assigned locker and gun point were situated in the State Department Building at different locations therein. Throughout this period, it took him 5 minutes to walk between his locker and gun point, both before the beginning and at the end of each shift.
(d) During this same period of time mentioned in (c), above, Mr. Baylor continued to be assigned to posts of duty at the Interior Department and GSA Buildings, and also at 1724 F Street, N.W., as well as locations at 1711 New York Avenue, 1951 Constitution Avenue, 515 22nd Street, 40123rd Street, the Winder Building (then the building of the old Passport Office) located on 17th Street across from the Executive Office Building, and in the State Department itself. It took him 10 minutes, both before the beginning and at the end of his shift, to walk between his gun point and post when he was assigned at 1724 F Street, N.W., at 1711 New York Avenue, and the Winder Building; 7 minutes when he was assigned at 515 22nd Street; 5 minutes when he was assigned in the State Department Building; and 10 minutes to walk from his gun point to his post when it was at 401 23rd Street, and 7 minutes to return from said location to the gun point.
(e) Mr. Baylor is being allowed 20 minutes per shift for changing into and out of his uniform, and 4 minutes per shift to draw and return his gun each workday throughout the entire claim period.
(f) Thus, it is found that during approximately the first 2 months in 1962, when his locker was located in the Interior Building, Mr. Baylor was required each day to spend 22 minutes both in preshift, and postshift overtime activities, or a total of 44 minutes per shift, when he was assigned to duty posts in the Interior and GSA Buildings; 27 minutes both in preshift, and postshift activities, or a total of 54 minutes per shift, when he was assigned at 1724 F Street, N.W.; and 32 minutes both in preshift, and postshift, activities, or a total of 64 minutes per shift, when he was assigned to the Executive Office Building.
(g) It is further found that continuing approximately 10 *413months in 1962, and throughout the remainder of the claim period, when Mr. Baylor’s locker was located in the State Department Building, he was required each day to spend 27 minutes both in preshift, and postshift, overtime activities, or a total of 54 minutes per shift, when he was assigned to duty posts at the Interior and GSA Buildings and at 1951 Constitution Avenue; 32 minutes both in preshift, and post-shift, activities, or a total of 64 minutes per shift, when he was assigned at 1724 F Street, N.W., 1711 New York Avenue, and the Winder Building; 24 minutes both in preshift and postshift, activities, or a total of 48 minutes per shift, when he was assigned to 515 22nd Street; 22 minutes both in preshift, and postshift, activities, or a total of 44 minutes per shift, when he was assigned at the State Department; and 27 minutes in preshift, and 24 minutes in postshift, activities, or a total of 51 minutes per shift, when he was assigned at 401 23rd Street.
(h) As to Mr. Baylor eating lunch while on duty during each shift, the credible testimony shows that different posts to which he was assigned presented different situations. On some posts he was usually given 30 minutes for lunch at irregular times set at the discretion of his supervisor. However, on other posts he did not get a full 30 minutes to eat.
When his post was a garage entrance at the Interior Department Building or a gate entrance at the GSA Building, he was required to check cars in and out of the garage or the gate. While eating he could sit down but remained on duty at his post, and performed the same kind of work as he did the other portions of his shift, which sometimes resulted in interruptions during the time he was having lunch. At the GSA Building, he was able to sit down and eat in a booth but he had to maintain a watch at this point for vehicles and check them in and out.
When assigned to duty at other posts in the Interior Department Building, and in the State Department Building, during the periods his locker was located in those buildings, he usually was relieved and ate lunch in the locker rooms; and although he was still on duty and subject to call while eating in locker rooms he was seldom interrupted.
When on duty in buildings where his locker room was not *414located, such as 1724 F Street, N.W., and 1711 New York Avenue, he ate his lunch at the guard desk but he was still on duty and performed such duties as were normally required of him the rest of his workday. For example, when he was assigned to duty at 1724 F Street, N.W., he ate lunch sitting at the guard desk; however, at times he had to stop eating and keep people from standing around and cause them to move along. On some posts, including those at 1951 Constitution Avenue, 515 22nd Street, 401 23rd Street and the Winder Building, he ate lunch at the guard desk; and on weekends at these posts he had to check passes, and to sign people in and out, while eating.
Except for the times he ate lunch in the locker rooms, mentioned above, Mr. Baylor was never relieved for lunch. At all other times, when eating on post, he was not able to avoid or postpone any work duty or f miction while he stopped to eat, and he simply got up and performed his duties the same as he did at times he was not eating lunch.
33. (a) Plaintiff Olden Bell was continuously employed throughout the entire claim period in Company A of the First Battalion at the Pentagon Building in Virginia. He Worked the daytime shift, i.e., from 8 a.m. to 4 p.m.; his locker was in the eighth corridor on the main floor of the building; and his gun point was located in the squad room, which was located some distance away from his locker.
(b) Mr. Bell’s assigned posts of duty in the Pentagon varied from day to day and included various entrances to the Joint Chiefs of Staff, Army Communications, Air Force Communications, and Defense Atomic Support Agency areas. It took him varying amounts of time to walk between his gun point and each one of these posts. Although the evidence does not disclose how often Mr. Bell actually was assigned to any one of said posts, it does show that he was regularly rotated almost every workday from post to post, and it may be reasonably assumed that he was on duty at each of the posts an equal amount of time. Therefore, it is concluded that in the case of this plaintiff, it is appropriate to use average figures in determining the amounts of overtime he spent proceeding to his various duty posts and returning therefrom to the gun point each day.
*415(c) It is concluded that the amounts of time claimed by Mr. Bell to perform certain preshift, and postshift, activities are excessive; and it is found that throughout the claim period, he was required each workday to spend 10 minutes getting into his uniform and the same amount of time changing back into civilian clothing; 8 minutes both before and after his shift traveling between his locker and gun point; 3 minutes drawing his gun and the same amount of time to return it; and 5 minutes both before and at the end of his shift traveling between the gun point and duty post; and, therefore, he was required to spend an average of 26 minutes overtime in performing both preshift, and postshift, activities, or 52 minutes per shift.
(d) As to Mr. Bell eating lunch while on duty, the credible testimony and evidence shows that he usually was allowed a full 30 minutes each workday for lunch, which he ate either at a cafeteria in the Pentagon or in his locker room; that he was always subject to call; and that on a few occasions he was called because of a fire or some other emergency and did not get to eat.
34. (a) Plaintiff William Byrd, Jr., was employed as a private in the GSA guard force during the entire claim period, first in Company I (no battalion designation) from 1961 to September 1962, and then in Company D (no bat-tallion designation) which later became Company B of the Second Battalion, subsequently redesignated Company D, all in Washington, D.C. While his company designations changed over the years, his duties and functions remained substantially the same.
(b) During 1961 and until early in 1962, Mr. Byrd’s locker was in the basement of the Veterans Administration (VA) Building on Vermont Avenue N.W., ;and he received his gun on post so it was unnecessary for him to go to a gun point before reporting for duty at his assigned posts. About 60 percent of the time he was assigned to posts of duty in Government buildings located at 1717 H Street N.W., and 1016 16th Street, N.W., both of which were located about 4 blocks from the VA building, and it took him the same amount of time traveling between his locker and both of these posts both before and after his shift. About 40 percent of the time *416lie was assigned to a Government building at 631 Massachusetts Avenue, N.W., and as best it can be determined, he usually drove to and from said post. It took him twice as much time to travel to this post as it did to make the return trip because of better traffic conditions at night when he apparently performed such travel.
(c) It is found that 60 percent of the time during this 1961-1962 period Mr. Byrd was required each workday to spend 10 minutes getting into his uniform and 5 minutes to re-dress in civilian clothes; and 7 minutes walking between his locker and post both before and after his shift; so he spent 17 minutes overtime performing preshift, and 12 minutes postshift, activities, or a total of 29 minutes per shift; that 40 percent of the time during this same period he was required each day to spend the same amounts of time stated above changing into his uniform and civilian clothes; 20 minutes traveling to his post and 10 minutes returning to his locker; so he was required to spend 30 minutes overtime performing preshift, and 15 minutes postshift, activities, or 45 minutes per shift.
(d) During the period from early in 1962, throughout the remainder of the claim period, Mr. Byrd’s locker was in the basement of the CIA Building located at 2430 E Street, N.W. It took him 10 minutes each day to change into his uniform before reporting for duty and a similar amount of time at the end of his shift to re-dress in civilian clothes. He continued to obtain his gun on post. His assigned posts of duty were very close to his locker, and so each day it took only 1 minute to get thereto and the same amount of time to return to his locker.
(e) It is found that during this 1962-66 period, Mr. Byrd was required to perform 11 minutes each day both in pre-shift, and postshift, overtime activities, or 22 minutes per shift.
(f) As to Mr. Byrd eating lunch while on duty, throughout the entire claim period he ate his lunch on post at a nearby desk. He carried a little bag with him and ate at irregular times as and when he found time from his duties to do so, and people were not around. While there is no evidence that he was not allowed as much time as necessary, up to a maxi*417mum of 30 minutes, for lunch, it actually took him no more than 10 minutes per day to eat.
35. (a) Plaintiff Shirley Dickens was employed as a member of the guard force throughout the entire claim period. He was a member of Company F of the Second Battalion from April 1961 to August 1961; Company D of the Second Battalion from August 1961 to October 1962; and Company E of the Second Battalion from October 1962 through the remainder of the claim period. He worked the evening shift, i.e., from 4 p.m. to 12 p.m., the entire time.
(b) During the April-August 1961 period, Mr. Dickens’ locker and “gun point” were located in the Executive Office Building, Washington, D.C., and his posts of duty were at 1724 F Street, N.W., and 1729 New York Avenue, N.W. It is found that each workday this plaintiff was required on an average to spend 10 minutes getting into his uniform, 2 minutes to walk to his gun point, 1 minute to draw his gun, and 3 minutes to walk to his post, or a total of 18 minutes in preshift overtime activities; and that he was required to spend similar amounts of overtime in performing these same activities in reverse at the end of his shift, or a total of 36 minutes per day in preshift and postshift overtime activities.
(c) During the period from August 1962 to October 1962, Mr. Dickens’ locker and gun point were in the GSA Building at 1800 F Street, N.W.; and his posts of duty were at 1724 F Street, N.W., and 550 17th Street, N.W. It is found that each workday this plaintiff was required to spend 10 minutes changing into his uniform, 1 minute to walk to his gun point, 1 minute to draw his weapon, and 5 minutes to proceed to his posts of duty, or a total of 17 minutes in preshift overtime activities; and that he was required to spend similar amounts of postshift overtime in performing these same activities in reverse, or a total of 34 minutes per day in preshift and post-shift overtime activities.
(d) During the period from October 1962 throughout the remainder of the claim period, Mr. Dickens’ locker and gun point were still located at the GSA Building; and he was required to spend a total of 20 minutes getting into his uniform and changing back into civilian clothes, and 2 minutes drawing and returning his gun. From October 1962 to Octo*418ber 1965, his post was at 1724 F Street, N.W., and he was required to spend identical amounts of overtime in performing the same preshift, and postshift, activities as he did when assigned to the two posts mentioned in (c), above. From October 1965 to the end of the claim period he was assigned to the GSA Building about one-tenth of the time, and it did not take any time for him to get to his post from his gun point. The remaining nine-tenths of the time he was assigned to the State Department Building, which was several blocks distant from the GSA Building, and it took him 8 minutes to proceed from the gun point to his post. It is found that each day during the period from October 1962 to October 1965, this plaintiff was required to spend 17 minutes both in preshift, and postshift, overtime activities, or a total of 34 minutes per shift; that one-tenth of the time from October 1965 throughout the remainder of the claim period, he was required to spend 12 minutes both in preshift, and postshift, overtime activities, or a total of 24 minutes per shift; and for nine-tenths of the time from October 1965 to the end of the claim period, he was required to spend 20 minutes both in preshift, and postshift, overtime activities, or a total of 40 minutes per shift.
(e) Whenever Mr. Dickens was assigned to a one-man post, such as 1724 F Street, N.W., or 1729 New York Avenue, N.W., he ate his lunch on post at irregular times during the 15 or 20 minutes intervening between his hourly patrols which took 30 minutes or more. While he was allowed a total of 30 minutes for lunch, he was never able to take that much time at any one sitting. Sometimes he ate part of his lunch between two patrols and the rest of it between two other patrols. While eating, lie was required to immediately respond to telephone calls and doorbell rings which caused interruptions in his lunch break. These interruptions did not occur “too often.”
When Mr. Dickens was assigned to duty at the State Department Building, he was given a 15-minute break after being on post for 2 hours, a 30-minute break after 4 hours, and another 15 minutes at the end of 6 hours. He ate his lunch in the locker room located some distance away from *419his post. He was 'always subject to call but was not interrupted very often.
36. (a) Plaintiff James K. Everett was regularly employed as a member of the guard force from May 8,1961 throughout the remainder of the claim period. From May 8, 1961 to February 2, 1962, he was a member of Company L, Third Battalion, and his locker was in the GSA Building. Mr. Everett did not present any testimony regarding the overtime he was required to spend in either preshift or postshift activities during this particular period of his employment.
(b) From February 2, 1962 throughout the remainder of the claim period, be was assigned to Company B of the First Battalion; worked the night shift, i.e., from 12 p.m. to 8 a.m.; used a locker and stood a very informal inspection, either in the locker room or guard room, in the Navy Annex on Columbia Pike, Arlington, Virginia; and obtained his gun and other equipment on post. He did not have a fixed post and most of the time he was assigned to a different post each night. From time to time he was assigned to posts in the Navy Annex itself; one of two nearby buildings comprising what is known as the Pentagon Annex; Government offices in Arlington Towers located about 2 miles from the Navy Annex; the Federal [Records Center and the Ford Plant in Alexandria, Virginia; Tempo 7 near National Airport ; the NASSIF, Leesburg Pike and Columbia Buildings at or near Baileys Crossroads, Virginia; and the GSA Store Warehouse at Franconia, Virginia. The testimony presented by this plaintiff relative to the distances involved and times involved in proceeding from his locker to various posts of duty, the percentage of his time that he was assigned to a particular post, and the amount of time he was required to spend in changing into and out of his uniform, as well as to perform other preshift and postshift activities, is generally quite vague, indefinite and incomplete.
(c) While, as previously stated in (a), above, Mr. Everett failed to testify as to the amount of overtime he spent in performing preshift and postshift activities when his locker was in the GSA Building from May 1961 to February .1962, is it reasonable to assume that he actually did perform some *420overtime each workday in complying witb the GSA regulations involved herein during said period; and it is concluded that in all fairness, he is entitled to compensation for a reasonable amount of overtime. However, since the record does not disclose the overtime actually required of him to perform either preshift or postshift activities, he is being allowed the bare minimum amount of overtime. Therefore, it is found that each workday during the particular period, Mr. Everett was required to spend a total of 30 minutes overtime per shift in performing preshift, and postshift, activities. As to the period from February 2, 1962 through the remainder of the claim period, on the basis of all of the credible evidence, it is concluded that the total overtime claimed by this plaintiff for preshift and postshift activities is excessive; and it is found that he was required to spend, on the average, 25 minutes overtime each day in performing both preshift and postshift activities, or 50 minutes per shift.
(d) As to Mr. Everett eating lunch while on duty, the credible testimony shows that his duties usually included making a roving patrol which took 45 minutes out of each hour during his shift leaving 15 minutes patrol-free time. During this 15-minute period, he could eat on post, subject to interruptions. He never had a full 30 minutes at any one time to eat and ate “on the fly.”
37. (a) Plaintiff Raymond R. Fitch was first employed as a member of the guard force in June 1964, and he continued this employment throughout the remainder of the claim period. During this entire period of time, he was a member of Company A of the First Battalion; his locker was located in the third corridor on the main floor in the Pentagon; his gun point was in the locker room; he worked on the evening shift, i.e., from 4 p.m. to midnight; and his posts of duty were always in the Pentagon.
(b) Mr. Fitch’s assignments changed each day, and the time required to travel from the gun point to his post depended upon whether he was assigned to a fixed post where guards relieved each other, or whether he was assigned to one of 15 “sequence” patrols normally scheduled in the Pentagon during each shift and in which section the particular sequence started. Sometimes while he was on a sequence patrol, *421be was called and instructed to go on duty at a fixed post, so be did not necessarily always end on a sequence patrol. Tbe record does not disclose how much of tbe time this plaintiff was assigned to a sequence patrol or a fixed post, or bow often be was on a fixed post when his scheduled shift ended. As to tbe amounts of time required by Mr. Fitch to travel from tbe gun point to bis post when on sequence patrol assignment, tbe testimony shows that be might be closer or farther from his gun point at tbe time be punched tbe last time-clock in the sequence than be was when be punched tbe first clock, depending on tbe location of the clocks in tbe particular sequence. It is found that on the average this plaintiff was required to spend 7 minutes each day walking from tbe gun point to his post of duty both when he was assigned to a sequence patrol and to a fixed post.
(c) The various sequence patrols were usually scheduled in such a manner that the last timeclock box was supposed to be keypunched 15 minutes prior to the end of the shift, i.e., at S: 45 p.m. when the shift was scheduled to end at 4 p.m., and the next timeclock box in sequence was supposed to be punched promptly at the beginning of the following shift, i.e., at 4 p.m. Guards assigned to sequence patrols were not relieved like guards on fixed posts, so they were allowed to leave their assigned area and return to the designated gun point immediately after they had punched the last box in the sequence. A nonplaintiff guard captain who was the Commander of Company A at the Pentagon during the period from October 1963 until the latter part of 1964, testified, in substance, that generally the guards assigned to sequence patrols, after punching the last timeclock box on their sequence about 15 minutes before the end of their scheduled shift, started back to their gun points and turned in their guns, proceeded to their lockers and changed into civilian clothes, and remained in the locker rooms until the end of their shifts; that, however, all of the timeclocks in a sequence normally had to be punched before the guard assigned thereto could start back to his gun point even though this might require his taking such action after the end of the shift; and that although a guard did complete his scheduled patrol, leave his duty area and get back into his civilian clothes be*422fore the end of Ms sMffc, be was still technically on duty and could not leave until the end of tbe shift. According to Mr. Fitch, most of the time when he was assigned to a sequence patrol he completed his patrol and started walking back to his gun point in the locker room prior to the end of the shift, but that, however, he could, and did, not actually turn in his gun and equipment until the end of the shift. While the record is not entirely clear, it is reasonable to assume, and found, that when this plaintiff was assigned to sequence patrols he usually returned to Ms locker, changed back into civilian clothes, and turned in his gun and equipment promptly at the end of his scheduled shift; thus he is being allowed postshift overtime only for returning his gun and equipment.
(d) When assigned to a fixed post, Mr. Fitch was not relieved until the end of his shift. Thereafter, he had to walk back to his gun point, which took, on the average, 7 minutes; turn in his gun and equipment; and re-dress in civilian clothes.
(e) On the basis of the credible testimony and evidence, it is found with respect to preshift overtime activities that each workday Mr. Fitch was required to spend, on the average, 10 minutes changing into his uniform, 3 minutes drawing his gun and sometimes other equipment, and 7 minutes walking from the gun point to his post, or a total of 20 minutes per shift; that, with respect to his postshift overtime activities, about one-half of the time throughout the claim period (when he was on fixed posts) this plaintiff was required each workday to spend, on the average, similar amounts of time in performing the same above-stated activities in reverse, or an identical total of 20 minutes; but that each workday during the other half of the time (when he was assigned to sequence patrols) the only postsMft overtime activities he was required to perform was to turn in his gun and other equipment, which took 3 minutes.
(f) Mr. Fitch was relieved and allowed 30 minutes for lunch each shift; which he sometimes ate in the cafeteria in the Pentagon.
38. (a) Plaintiff Charles H. Fox, throughout the entire claim period, was regularly employed as a member of Com*423pany B of the First Battalion (along with plaintiff Everett — see finding 36). He (the same as Mr. Everett) worked the night shift, i.e., from 12 p.m. to 8 a.m.; his locker was in the Navy Annex on Columbia Pike, Arlington, Virginia; and he received his gun from the guards he relieved at various posts. He was regularly assigned to posts at the Pentagon Annex; the Franconia A Building in Franconia, Virginia; the Jefferson Tower Building, Arlington, Virginia; and the Greeley Building on North Courthouse Boad in Arlington. He was usually assigned to a different post each night and was on duty at each of the above-mentioned locations about an equal number of times.
(b) On the basis of all of the credible evidence, it is concluded that the total overtime claimed by Mr. Fox for pre-shift and postshift activities is excessive; and it is found that he was required to spend, on the average, 22 minutes overtime each day in performing both preshift and postshift activities, or 44 minutes per shift.9
(c) Mr. Fox never was relieved from duty and given a regular lunch break. He usually tried to “grab a bite” while making his hourly 45-minute patrols, or while he was at his assigned post, and “caught lunch when [he] could.” He was occasionally interrupted while eating.
39. (a) Plaintiff Robert I. Gardner, throughout the entire claim period, was regularly employed and assigne/d to Company D, E, or F of the Second Battalion; his locker and gun point were located in the basement of the GSA Building, 1800 F Street, N.W., Washington, D.C. (the same as plaintiff Dickens — finding 35(c)); his assigned post was in a “one-man” building at 1750 Pennsylvania Avenue, N.W., Washington, D.C., located less than 3 blocks from the GSA Building; and he worked the night shift, i.e., from 12 p.m. to 8 a.m.
(b) On the basis of the credible testimony (including testimony presented by plaintiff Dickens mentioned in (a), above), it is concluded that the amounts of time which Mr. Gardner claimed he was required to spend each day in order *424to perform both, preshift, and postsbift, activities, are inflated and excessive; and it is found that each, workday this plaintiff was required to spend, on the average, 10 minutes to get into his -uniform, 2 minutes to walk to his gun point, 3 minutes to draw his weapon, and 8 minutes to proceed to his post of duty, or a total of 23 minutes in preshift overtime activities; and that he was required to spend similar amounts of postshift overtime in performing these same activities in reverse, or a total of 46 minutes per day in preshift and post-shift activities.
(c) Mr. Gardner did not receive a regular lunch break. Although other Government employees worked in the building during his shift, he was the only guard on duty, and a relief guard did not replace him at any time during the shift. He had to make a 45-minute patrol each hour, and never had 30 minutes at any one time to eat. He ate a quick lunch whenever he could find the time to do so.
40. (a) Plaintiff Albert E. Haas, during the entire claim period, was regularly employed as a member of the guard force, as a sergeant from April 1961 to September 1961, and as a lieutenant from September 1961 through the claim period; he was in Company A of the First Battalion; he was assigned to duty at the guard office in the Pentagon; he worked all three shifts on rotation; and his locker was located in the guard office.
(b) Although there is testimony and other evidence in the record that generally the shifts of guards assigned to supervisory duties and guard officers were regularly scheduled at various times prior to the beginning hour of the shifts scheduled for other members of the guard force, i.e., e.g., at 7:45 a.m. when the regular guard shift started at 8 a.m., Mr. Haas presented credible testimony that his regularly scheduled shift commenced at the same hour as the other guard members. However, he reported on duty early because he was required to change into his uniform, shin© his shoes, and take all other steps required “to look respectable.” Thereafter, he had to obtain his weapon; check the detail shift to see if a guard had called in sick, and, if so, to call another guard to report for duty; and to determine whether any other assign*425ment changes were necessary and to make arrangements therefor; all of which he stated took another 15 minutes.
(c) The only postshift overtime activity performed by Mr. Haas was to change back into civilian clothes. It is found that each workday, this plaintiff was required to spend 10 minutes changing into his uniform and making himself presentable, and 15 minutes in performing other necessary pre-shift activities, or a total of 25 minutes per shift; and that he was required to spend 10 minutes overtime changing back into civilian clothes at the end of each shift, or a total of 85 minutes overtime in performing preshift and postshift activities per shift.
(d) As to lunch periods, Mr. Haas ate in the cafeteria once in a great while, sat down to eat about 80 percent of the time, and ate on the run the remainder of the time, i.e., he ate while proceeding to some point in connection with his duties. He did not eat lunch at any regular time but simply when he had a chance to do so, and was not interrupted. While the evidence does not show how often his lunch was interrupted or that he was limited to less than 80 minutes for lunch, he took only 10 or 15 minutes each day to eat.
41. (a) Plaintiff Eugene Augustus Harris, throughout the entire claim period, was regularly employed as a member of Company A of the First Battalion; assigned to various roving patrols in the Pentagon; and worked the first and third shifts, i.e., from 12 p.m. to 8 a.m. and from 4 p.m. to 12 p.m., respectively. From the beginning of the claim period until sometime (the date is not disclosed by the record) in 1964, his locker was in the eighth corridor, and his gun point where he drew his weapon and sometimes other equipment was located in the third corridor locker room.
(b) It is found from all the testimony in the record that during the period Mr. Harris was assigned a locker in the eighth corridor, he was required each workday to spend, on the average, 6 minutes to change into his uniform and make himself presentable for duty; 5 minutes to walk from the locker to his gun point; 3 minutes to draw and inspect his gun and other equipment; and 5 minutes proceeding from the gun room to his assigned patrol points, or a total of 19 minutes overtime in performing preshift activities per day. *426As to postshift activities, Mr. Harris admitted that be usually was able to complete his roving patrol and get back to the gun room before the end of his shift, and accordingly, he limited his claim to the overtime he assertedly spent in the gun room returning his weapon and equipment, walking from the gun room to the locker, and changing back into civilian clothes. It is found that Mr. Harris was required each workday to spend, on the average, 3 minutes returning his gun and equipment; 5 minutes walking from the gun point to the locker room, and 6 minutes changing into civilian clothes, or a total of 14 minutes in postshift activities per day. Thus, this plaintiff was required to spend a total of 33 minutes overtime in performing preshift, and postshift, activities per shift.
(c) Sometime in 1964 (see (a), above), a locker in the third corridor, where his gun point was located, was assigned to Mr. Harris, and he used this locker room and the gun point located therein throughout the rest of the claim period. Therefore, he was not required to spend the 5 minutes allowed him each day during the earlier period to walk between his locker and the gun point both before and after completing his shift.10 Accordingly, since the amounts of overtime found to have been spent by Mr. Harris in performing all of the other preshift, and postshift, activities involved during this later period are found to be the same as those spent by him in performing these same preshift, and post-shift, activities during the earlier period (set forth in (b), above), it is found that he was required each day to spend 14 minutes overtime in performing preshift activities, and 9 minutes overtime in performing postshift activities, or a total of 23 minutes overtime per shift, during the period from sometime in 1964 through the end of the claim period.
(d) As to lunch breaks, Mr. Harris was allowed a full 30 minutes in which to eat either in the cafeteria or some place else.
42. (a) Plaintiff Harold L. Harley was regularly em*427ployed as a guard from August 2, 1962 through the end of the claim period. He was a member of Company E of the Second Battalion; his locker was located in the Munitions Building at 19th Street, N.W. and Constitution Avenue, N.W., Washington, D.C.; his gun issue point was one block away from there in the main Navy Building; and his guard post was located about 6 blocks away at Barton Hall on Haines Point to which post he traveled on foot part of the time and by car part of the time.
(b) It is found from the credible evidence that Mr. Harley was required to spend, each workday, on the average, 10 minutes getting into his uniform; 3 minutes to walk from the locker to the gun point; 3 minutes to draw his gun; and, on the average, 9 minutes to proceed to his duty post, or a total of 25 minutes overtime in performing preshift activities ; and that he was required to spend the same amount of time in performing the identical activities in reverse at the end of his shift, or a total of 50 minutes overtime per shift.
(c) As to lunch periods, while it seems that some of the other guards who worked at the same building where Mr. Harley was assigned sometimes carried their lunch to work and ate while on duty, this plaintiff chose not to do so and he did not take any time to eat while on duty. He ate at home both before and after work each day. He was assigned to an hourly roving patrol that took 45 minutes, and left him 15 minutes in each hour during which time he could rest, when he was not signing in and out persons entering and leaving the building.
43. (a) Plaintiff Edward C. Holmes was employed as a guard throughout the claim period as a member of Company D, Second Battalion. His locker was in the basement of the State Department Building, and his gun point and post of duty were in the guard office located on the first floor of said building. His duties included operating a Protective Electronic System console, typing, answering telephones and issuing keys.
(b) It is found that amounts of time claimed by this plaintiff to perform preshift and postshift overtime activities are inflated; that each workday he was required to spend 10 minutes getting into his uniform; 3 minutes to walk from the *428locker room to bis gun point; and 3 minutes to draw bis weapon and assume bis duties on post, or a total of 16 minutes of presbift overtime; and that be was required to spend similar amounts of overtime to perform tbe same activities in reverse, or a total of 32 inmutes overtime per shift.
(c) Mr. Holmes did not receive a regular luncb break. He ate at the console whenever things were quiet and be found an opportunity to do so. His lunch often became cold while be was trying to eat and at tbe same time perform other required duties. He was never relieved at tbe console by other guards, and left it only to go to the bathroom.
44. (a) Plaintiff Pearl E. Hoover was regularly employed as a guard throughout the entire claim period. He was first a member of what was termed “the old Pennsylvania Avenue Group,” and later with Companies D, E, and F, which, despite the different identification letterings, was actually the same company.
(b) From April 1961 to September 13,1963, Mr. Hoovers locker was in the GSA Building. His assignments were changed almost every day and included posts in the guard room and in the East Court of the GSA building; in the guard office and basement of the Interior Department Building; and buildings at 1951 Independence Avenue, 1724 F Street, N.W., and the Walker-Johnson Building at 1724 New Tork Avenue, N.W., all in Washington, D.C. He had two gun points, one in the GSA Building, and one in the Interior Department Building. On days he worked in the GSA or other nearby buildings, his gun point was in the GSA Building, and on days he worked at the Interior or other buildings close thereto, his gun point was in the Interior Building.
(c) It is concluded that the amounts of time Mr. Hoover claimed it took him to perform certain preshift, and postshift, activities, especially some of the amounts of time it assertedly took him to walk between his locker and gun point, and between the gun point and his assigned posts of duty, are inflated ; and it is found that each day when he was assigned to duty in the guard office at the GSA Building, it took him 10 minutes to get into his uniform and a similar amount of time to change back into civilian clothes; 3 minutes to walk each way between the locker room and gun point; 3 minutes to *429draw his weapon and the same amount of time to return it; and 3 minutes to walk each way between the gun point and the post, amounting to 19 minutes of both preshift, and postshifb, overtime activities, or 38 minutes per shift; that when he was assigned to duty in the East Court of the GSA Building and at 1724 F Street, N.W., it required identical amounts of time for him to perform these same aforestated activities, except that it took 6, rather than 3, minutes to walk between the gun point and his post, amounting to 22 minutes of both preshift, and postshift, overtime activities, or a total of 44 minutes per shift; that when he was assigned to the Walker-Johnson Building, it required identical amounts of time for him to perform these same aforestated activities, except that it took 9 (instead of the 15 minutes claimed), rather than 3, minutes to walk between the gun point and his post, amounting to 25 minutes of both preshift, and postshift, overtime activities, or a total of 50 minutes per shift.
(d) It is further found that when his gun point was in the Interior Department and he was assigned to the guard office therein, it required identical amounts of time for him to perform these same aforestated activities (see (c), above), except that it took 10 minutes to walk between the locker room and the gun point, and no time to get to his post as it was in the guard office, amounting to 26 minutes of both preshift, and postshift, overtime activities, or a total of 52 minutes per shift; that when his gun point was in the Interior Department and he was assigned to a post at the garage in that building, he required identical amounts of time to perform these same aforesaid activities (see (c), above), except that it again took him 10 minutes to walk between the locker room and the gun point, and 3 additional minutes to walk between the gun point and his post, amounting to 29 minutes of both preshift, and postshift, overtime activities, or a total of 58 minutes per shift; that when his gun point was in the Interior Building and he was assigned to the building at 1951 Independence Avenue, about 1 y2 blocks away, it required identical amounts of time to perform these same aforestated activities (see (c), above), except that it again took 10 minutes to walk between the locker room and gun point, and 5 minutes to walk between the gun point and his post, amounting to 31 minutes of both *430preshift, and postshift, activities, or a total of 62 minutes per shift.
(e) From September 13,1963 to sometime in August 1965, Mr. Hoover’s locker was in the Civil Service Commission Building; and his gun point was some distance away, at or near the main guard desk in said building, where he was always assigned.
(f) It is concluded that the amounts of time claimed by Mr. Hoover to perform certain preshift, and postshift, activities are inflated; and it is found that during this period (1963-1965), Mr. Hoover was required each workday to spend 10 minutes getting into his uniform, and the same amount of time to change back into civilian clothes; 3 minutes traveling between his locker and gun point-post, both before and after his shift; and 3 minutes both drawing and returning his gun, amounting to 16 minutes both in preshift, and postshift, overtime activities, or 32 minutes per shift.
(g) From August 1965 through the end of the claim period in February 1966, Mr. Hoover’s locker was in the State Department Building, and his duty assignments ranged from the “confidential trash” guard detail in said building to posts at the 21st Street, and C Street, entrances thereto.
(h) It is concluded that the amounts of time claimed by Mr. Hoover to perform certain preshift, and postshift, activities, especially the “average” time of 10 minutes assertedly required for him to walk between his gun point and various posts of duty both prior to, and after, his shift, are highly inflated; and it is found that each day it took him 10 minutes to get into his uniform and the same amount of time to change back into civilian clothes; 3 minutes to walk between his locker and gun point both before and after his shift; 3 minutes to draw, and the same amount of time to return, his gun; and, on the average, 5 minutes to walk between the gun point and various posts of duty, both before starting, and after completing, his tour of duty; amounting to 21 minutes of overtime for both preshift, and postshift, activities, or a total of 42 minutes per shift.
(i) As to lunch periods, during the 1961-1963 period when Mr. Hoover was assigned to the GSA or Interior *431Buildings, he admittedly had a total of 30 minutes to obtain and eat lunch, but he picked up his lunch “on the fly” at the building cafeteria and ate it on post. On other days, when he was assigned to 1724 F Street, N.W., or the Walker-Johnson Building, he obtained his lunch at the “blind stand,” and took it back to his post where he ate. While eating, he was occasionally interrupted by the need to furnish information and answer other requests for service.
Substantially identical conditions prevailed when Mr. Hoover was assigned to duty at the Civil Service Commission Building during the period from 1963 to 1965, and he ate his lunch on post in said building.
During the 1965-1966 period when Mr. Hoover was assigned to the State Department Building, he usually had a full 30 minutes off for lunch which he ate in the building cafeteria.
45. (a) Plaintiff Abraham B. Hicks was regularly employed as a member of the guard force during the entire claim period. Originally, he was employed in the State Department Group (no company or battalion designation), and sometime later he was assigned to Company D. His assigned lockers during the claim period were in the South and East Buildings at the State Department. It was stipulated by the parties that since Mr. Hicks’ locker was in the East Building for a period of only 4 months of the claim period, the South Building locker location would be used for overtime computation purposes throughout the entire period in his case.
(b) Mr. Hicks was assigned to various posts, including the State Department Building located at 26th and E Streets, N.W., about 2y2 blocks away from the locker room in the South Building; the Washington Auditorium; and two buildings occupied by the CIA, namely the Riverside Stadium, which was about 1% blocks from the South Building, and the Central Building, which was about a block or so from the South Building. Forty percent of the time he was assigned to either the State Department or the Washington Auditorium, and 60 percent of the time he was assigned to the Central Building (a very small part of this time was at Riverside Stadium). When he was assigned to the State Department Building and the Washington Auditorium, his *432gun point was in the State Department Building, and when he was assigned to the Central Building and Riverside Stadium, his gun point was in the South Building.
(c) It is concluded that the amounts of time claimed by Mr. TFficfcs to perform certain preshift, and postshift, activities are excessive; and it is found that throughout the claim period, he was required each workday to spend 10 minutes getting into Ms uniform and the same amount of time changing back into civilian clothes, or 20 minutes per shift; that, on the average, Mr. Hicks was assigned to duty at the State Department Building 20 percent of the time, and to the Washington Auditorium 20 percent of the time; that when he was assigned to the State Department Building, and the Washington Auditorium, he was required to spend 10 minutes each day walking between the locker and gun point, both before and after Ms shift, 8 minutes to draw Ms weapon, and 2 minutes to return the gun; that when he was assigned to duty in the State Department Building, it took him 2 minutes to walk both ways between the gun point and Ms post, and therefore, he spent a total of 27 minutes overtime in performing preshift, and 26 minutes in postshift, activities, or 53 minutes per shift (including 20 minutes changing into and out of Ms uniform); that when he was assigned to the Washington Auditorium, it took him 10 minutes each day to walk both ways between his gun point and post, and, therefore, he was required to spend a total of 35 minutes overtime in performing preshift, and 34 minutes in post-shift, activities, or 69 minutes per shift (including 20 minutes getting into and out of Ms uniform).
(d) It is further found that during the 60 percent of the time Mr. Hicks was assigned to the Central Building (and Riverside Stadium), he was required to spend each day (in addition to 20 minutes changing into and out of Ms uniform), 2 minutes walking between the locker and gun point both before and after his shift; 2 minutes to draw his gun and 2 minutes to return it; and 5 minutes to walk both ways between the gun point and post, and, therefore, he spent a total of 19 minutes overtime in performing preshift, and 19 minutes in postsMft, activities, or 38 minutes per shift.
*433(e) Mr. Hicks never had a full 30 minutes at one time for lunch. He brought a lunch to work and ate it either while making one of his hourly 45-minute patrols, or at the guard desk during the 15 minutes between patrols when he was interrupted to check persons in and out or respond to alarm bells.
46. (a) Private Jay Archibald Jones was employed as a guard during the entire claim period. He was originally assigned to Company B, which was subsequently redesignated Company D (no battalion designation). The testimony presented by this witness concerning the location of his various assigned posts, lockers, and gun points, and the periods of time that he was assigned thereto, is very vague, indefinite, confused, unclear, and generally unsatisfactory. Furthermore, the separate finding requested as to this plaintiff does not specifically set forth the amount of time actually required by him to travel between the various lockers and gun points, nor to and from his several posts of duty. In view of the foregoing, and since defendant has failed to make specific objections to plaintiff’s requested findings, except with regard to the time claimed by him to change into and out of his uniform, and to draw and return his weapon, much of the wording in the instant finding is necessarily general; and the amounts of preshift, and postshift, overtime found to have been performed by Mr. Jones include “average” time figures, and are stated in summary form.11
(b) As best it can be determined from the record, Mr. Jones, from time to time, was assigned to various State Department Buildings, including the East and South build-hags, and the State Department itself; several CIA Buildings, including Biverside Stadium, Central, “M,” “O,” and possibly “17”; one at 1750 Pennsylvania Avenue, N.W., and the Executive Office Building, all in Washington, D.C. It appears that Building 17 and certain other temporary buildings were tom down sometime in 1962, and thereafter throughout the claim period Mr. Jones’ locker was in the South Building most of the time.
*434(c) Several different lockers were assigned to Mr. Jones during the claim period because from time to time the buildings (apparently temporary) in which they were located were tom down. Originally, he drew a gun at his assigned posts; 'but later this practice was changed, and he was required to obtain and return his gun at a gun point located somewhere in the area in which he worked. Since the work areas were changed, his gun point varied depending upon the. location of his post. When he was assigned to the State Department Building, his gun point was in the main part of that building. Because of these changes in lockers, gun points, and posts, this plaintiff spent different amounts of preshift, and postshift, time each day traveling between his locker and gun point, and to and from his post.
(d) It is found that throughout the entire claim period Mr. Jones was required each workday to spend 10 minutes both putting on his uniform and changing back into civilian clothes, or 20 minutes per shift.
(e) It is further found, in summary, that from the beginning of the claim period in April 1961 until Building 17 and other buildings were razed sometime in 1962, when Mr. Jones’ locker was in Building 17 and he was assigned to duty at “Q” Building, he was required each day to spend a total of 17 minutes performing both preshift, and postshift, overtime activities, or 34 minutes per shift; that when he was assigned to “M,” East, or Central Buildings, both his preshift, and postshift, overtime amounted to 19 minutes, or a total of 38 minutes per shift; that when he was assigned to the Executive Office Building, he spent 29 minutes both in preshift, and postshift, overtime activities, or a total of 58 minutes per shift; that when he was assigned to the State Department Building, he spent 22 minutes both in preshift, and postshift, overtime activities, or 44 minutes per day; but that during the period when his locker was in Building 17, his gun point was in the State Department Building, and he was assigned to 1750 Pennsylvania Avenue, both his preshift, and post-shift, overtime activities amounted to 37 minutes, or 74 minutes per shift.
(f) It is also found that when Mr. Jones’ locker was in the South Building from about 1962 throughout the re*435mainder of tbe claim period, lie was assigned to duty at the East, South, Central, State Department, and Executive Office Buildings, and at 1750 Pennsylvania Avenue, N.W.; that during this time when he was assigned to duty at the South, East, Central, and State Department Buildings, he was required to spend a total of 19 minutes overtime each' day in performing both preshift, and postshift, overtime activities, or 38 minutes per shift; that when he was assigned to duty at 1750 Pennsylvania Avenue, N.W., and his gun point was in the State Department Building, he spent a total of 42 minutes in both preshift, and postshift, overtime activities, or 84 minutes per shift; and that when he was assigned to the Executive Office Building and his gun point, as well as his locker, was in the South Building, he was required to spend a total of 29 minutes both in preshift, and post-shift, overtime activities, or a total of 58 minutes per shift.
(g) Mr. Jones was not aware that he was supposed to be allowed 30 minutes per day to eat lunch; he was told that he was not to have a lunch period unless authorized by his superiors; and in guard school, he was advised to eat Ms lunch on post. He brought his lunch from home and took about 5 minutes each day to eat while he was on duty at Ms assigned post.
47. (a) Plaintiff Brantley J. Kennerly was regularly employed as a member of the guard force from May 28, 1963 throughout the remainder of the claim period. He was a member of Company B, First Battalion; his locker was located in the Navy Annex on Columbia Pike, Arlington, Virgmia; and he worked the first relief, i.e., 12 p.m. to 8 a.m. (the same as plaintiffs Everett (finding 36) and Fox (finding 38)).
(b) Mr. Kennerly was assigned from time to time to a building (umdentified) in Kosslyn, one identified as T-7, and one at Franconia, all in Virginia. He worked at the first two mentioned locations more than he did at Franconia. He obtained Ms gun on post.
(c) It is concluded that the amounts of time claimed by Mr. Kennerly to perform all of the various preshift and postshift activities required of Mm are inflated; and it is found that each day he spent 10 minutes getting into his *436uniform and 10 minutes changing back into civilian clothes; and 15 minutes, on the average, each day traveling to and from his various posts, amounting to a total of 25 minutes both hi preshift, and postshift, overtime activities, or 50 minutes per shift.
(d) Mr. Kennerly was not given a regular lunch break. He made hourly patrols that took about 30 minutes, and ate lunch at irregular times either while walking on patrol, or at his desk after completing a round during which time he was sometimes interrupted to perform regular guard duties.
48. (a) Plaintiff Willie Kalphus Lightfoot was regularly employed as a guard throughout the entire claim period, and he worked the first relief, i.e., from 12 p.m. to 8 a.m.
(b) During the period from the beginning of the claim period in April 1961 to August 1,1961, he was a member of the Department of Interior Group, Second Battalion; Ms locker was in the basement of the Executive Office Building; he was assigned to duty at posts in the GSA, Interior, and Walker-Johnson, Lemon, and Executive Office Buildings, and buildings at 1724 F Street, N.W., 1809 G Street, N.W., and 1776 Pennsylvania Avenue, N.W., all in Washington, D.O. He admittedly obtained Ms gun on post at all of the above-stated locations, except when he was assigned to duty at the GSA, Interior, and Executive Office Buildings, at which times he obtained and returned his gun at a gun point located on the first floor of the Executive Office Building.
(c) It is concluded that the amounts of time claimed by Mr. Lightfoot to do certain of the preshift and postshift activities performed by him are excessive; and it is found that during tMs period from April to August 1961, when he was assigned to the Executive Office Building, wMch is where he worked the most, he was required to spend a total of 18 minutes overtime each day in performing both presMft, and postshift, activities, or 36 minutes per shift; that when he was assigned to the GSA building, both his preshift, and postsMft, overtime totalled 26 minutes, or 52 minutes per sMft; that when he was assigned to the Walker-Johnson and Lemon Buildings, and the building at 1724 F Street, N.W., both his preshift and postshift, overtime totalled 15 minutes, or 30 minutes per shift; and that when he was as*437signed to the building at 1776 Pennsylvania Avenue, N.W., and 1809 G Street, N.W., both his preshift, and postshift, overtime totalled 20 minutes, or 40 minutes per shift.
(d) During the period from August 1, 1961 to November 12, 1961, Mr. Lightfoot was a member of Company F, Second Battalion; and his locker was located in the water-tower of the GSA Building. His posts of duty were in the GSA, Interior, Walker-Johnson and Lemon Buildings, and at 1724 F Street, N.W., 1776 Pennsylvania Avenue, N.W., and 1809 G Street, N.W. When he was assigned to the GSA and Interior Buildings, his gun point was on the first floor of the GSA Building. When he was assigned to the other above-mentioned posts, he obtained his gun from the guard being relieved, so he went directly from the locker to his post.
(e) It is found that each day when Mr. Lightfoot was assigned to the GSA Building, he was required to spend a total of 19 minutes overtime in performing both preshift, and postshift, activities, or a total of 38 minutes per shift; that every day when he was assigned to the Interior Department, both his preshift, and postshift, overtime totaled 26 minutes, or 52 minutes per shift; that when he was assigned to each of the other posts mentioned in (d), above, i.e., all but GSA and Interior, and walked directly from his locker in GSA to his post without having to go to a gun point, he was required to spend each day a total of 21 minutes overtime both in performing preshift, and postshift, activities, or a total of 42 minutes per day.
(f) During the period from November 12, 1961 throughout the remainder of the claim period, Mr. Lightfoot was a member of Company D, Second Battalion; and his locker was located in the basement of the State Department Building, his gun point was on the first floor of that building, and all of his several posts also were in said building. Sometimes he was assigned to make patrols and other times at various entrance posts.
(g) It is found that during this last period of employment, Mr. Lightfoot was required to spend each day a total of 21 minutes overtime in performing both preshift, and post-shift, activities, or 42 minutes per day.
*438(h) Regarding luncli breaks, Mr. Ligbtfoot, from April to August 1961, did not have a regularly scheduled lunch period, and he was expected to, and did, eat lunch during the course of performing his guard duties. Similarly, during the period from August to November 1961, he did not have a regularly scheduled lunch period, and ate when he found the time to do so while performing his assigned duties. During the November 1961-February 1966 period, the cafeteria in the State Department was not open when he was on duty. On nights he was assigned to roving patrols, which was most of the time, he ate either while making his hourly 45-minute patrol, or during one of the 15-minute periods intervening between patrols. On nights when he was assigned to a fixed post at an entrance to the State Department Building, he was relieved for a 30-minute lunch break. While he was on duty and subject to call during his lunch breaks, he was not interrupted a great deal.
49. (a) Plaintiff Harvey C. Mangum, throughout the entire claim period, was a member of Company A, First Battalion ; his locker was in the eighth corridor on the main floor of the Pentagon; his gun point was “across the court” at the Pentagon; and he was assigned to duty on rotation at various posts in the Joint Chiefs of Staff area, the Defense Intelligence Agency, and the Defense Atomic Support Agency, all in the Pentagon.
(b) It is concluded that the amounts of time that Mr. Mangum claimed to have necessarily spent in performing certain preshift, and postshift, activities are inflated; and it is found that each day he was reasonably required to spend 10 minutes both getting into his uniform and changing back into his civilian clothes; 4 minutes, on the average, walking each way between his locker and gun point; 3 minutes to draw his gun and the same amount of time to turn it in; 3 minutes, on the average, to walk between the gun point and post, both before and after his shift; and that, therefore, he spent a total of 20 minutes of overtime in performing both pre-shift, and postshift, activities, or 40 minutes per shift.
(c) Mr. Mangum was relieved to take a lunch break some of the time; and he was allowed to eat in the cafeteria whenever a relief man was provided; however, out of preference, *439be usually ate on bis post at irregular times whenever he felt like it and did not have other duties to perform. He was assigned to security posts and his lunch was interrupted whenever it was necessary for him to check a pass presented by someone or to stop an unauthorized person from entering the area.
50. (a) Plaintiff Willie Mayes was employed as a guard throughout the entire claim period. He was a member of the Interior Department Group, Second Battalion, from the beginning of the claim period in April 1961 to August 1, 1961; Company F, Second Battalion, from August 1, 1961 to January 21, 1962; and Company D, Second Battalion, from January 21, 1962 to the end of the claim period in February 1966.
(b) It is found that during the entire claim period, Mr. Mayes was required to spend 10 minutes each day getting into his uniform and the same amount of time changing back into civilian clothes.
(c) During the time in 1961 that Mr. Mayes was a member of the Interior Department Group, his locker was in the basement of the Executive Office Building, and his gun point was on the first floor of that building; during the 1961-1962 period that he was in Company F, his locker was on the second floor of a small budding at the rear of the GSA Administration Building, 18th and F Streets, N.W., and his gun point was about 1 block away on the first floor of the latter building; and during the 1962-1966 period that he was in Company D, his locker was in the basement of the State Department Building, and his gun point was on the first floor at the main entrance of said building, all in Washington, D.C. Mr. Mayes never had a permanent post and was assigned on rotation to all posts within the jurisdiction of each company at the time he was a member of the above-mentioned group and companies. As best it can be determined from an unsatisfactory record, this plaintiff was assigned on rotation to several different posts at the State Department Building; Executive Office, GSA, and Interior Department-Buildings, a building on Jackson Place, N.W., and a Navy Building at 1931 Constitution Avenue, N.W., all in Washington, D.C.
*440(d) An undated document signed by Mr. Mayes was received in evidence (Plaintiffs’ Ex. 24), which sets forth the approximate number of inmutes assertedly taken by him to perform various preshift and postshift activities. This document simply states, 'among other things, in substance, that as to travel between Ms locker and gun point, each day it took him 5 minutes to move both ways between the “closest” points, and 10 minutes between the “farthest” points; and that it took him from 5 to 10 minutes to move both ways between his gun point and post of duty. WMle the document discloses the buildings in wMch the lockers and gun points were located, it does not show the “closest” and “farthest” points, nor the location of any of the posts or times required to move between a particular gun issue point and post. The testimony presented by this plaintiff in regard to the above and other preshift and postsMft activities performed by him is generally indefinite and far from satisfactory.
(e) It is concluded that the amounts of overtime that Mr. Mayes claimed he spent in perf orming travel and at the gun point are excessive and not supported by the evidence; and it is found that in addition to the time allowed him to don his uniform and to change back into civilian clothes (see (b), above), he was required each day to spend, on the average, both before and after his shift, 3 minutes moving between his locker and gun point, 3 minutes at the gun point, and 5 minutes traveling between the gun point and post, amounting to 21 minutes of preshift, and 21 minutes of post-shift, overtime, or 42 minutes per shift.
(f) Mr. Mayes was not given a regular lunch break, and ate his lunch sometime during his sMft while on post performing his regular duties. He was only occasionally interrupted while eating.
51. (a) Plaintiff Steve Henry Montgomery, throughout the entire claim period, was employed as a guard, and a member of Company B (later changed to Company D), Second Battalion; worked the second relief, i.e., 8 a.m. to 4 p.m. shift; used a locker located on the third floor of the GSA South Building at 2330 E Street, N.W., Washington, D.C.; and used a gun point located either at the State Department, or at the Auditorium on 22d Street, N.W. (most of the *441time) where he was assigned to duty, which was about three-quarters of a mile from the GS A South Building.
(b) It is found that each day Mr. Montgomery was required to spend 10 minutes 'both getting into his uniform and changing back into civilian clothes, 3 minutes walking each way between his locker and gun point, 3 minutes both drawing and returning his gun, and, on the average, 20 minutes traveling each way between his post and gun point, amounting to a total of 36 minutes overtime in performing both pre-shift, and postshift, activities, or 72 minutes per shift.
(c) Mr. Montgomery did not have a regularly scheduled lunch break, and ate his lunch on post while he was performing his regular guard duties, such as answering telephones, and checking the badges of persons entering and leaving the building.
52. (a) Plaintiff Benjamin McCrady was employed as a member of the guard force from September 6, 1962 through the remainder of the claim period. From September to November 1,1962, he was attached to Company D; and from the latter date through the remainder of the claim period, he was assigned to Company B, First Battalion. It was stipulated that the facts concerning this plaintiff’s entire service during the claim period would be governed by those established by his testimony relating to the period from November 1, 1962 to the end of the claim period.
(b) During the first 2 weeks in November 1962, Mr. McCrady’s locker was hr the Navy Annex on Columbia Pike, Arlington, Virginia, but he was assigned to duty at Franconia “A” Building, Franconia, Virginia. Thereafter, he was transferred to Franconia, and both his locker and post were there until September 13,1965, when he was transferred to Building SA-16 in Rosslyn, Virginia. While working at Franconia, after getting into his uniform, and drawing a weapon, he had to call company headquarters and obtain his instructions for the day. Thereafter, he proceeded to his post, which sometimes was at a guard desk in the building near his gun point but most of the time was at the main gate to the building grounds located some distance away.
(c) It is found that each workday during the entire claim period, Mr. McCrady spent 7 minutes getting into his uni*442form and tbe same amount of time changing back into civilian clothes; and he spent 2 minutes either drawing, or signing out on a log, his gun, and the same amount of time either returning, or signing in, his gun. (Sometimes he just signed in and out for a gun but actually obtained the gun from the guard he was relieving.)
(d) It is further found that, in addition to the amounts of time spent by Mr. McCrady, stated in (c) above, each day when he was assigned to duty at Franconia, he also was required to spend 1 minute to walk from his locker to the guard desk, where he either drew, or signed for, his gun, and telephoned headquarters; 3 minutes to call for and receive instructions for the day; and, on the average, 10 minutes to walk to his post, or a total of 23 minutes preshift overtime; that, at the end of his shift, he was required to spend identical amounts of time performing these same activities in reverse, except that he did not have to call in for instructions, which reduced the postshift time to 20 minutes; and, thus, his preshift, and postshift, overtime totalled 43 minutes per shift.
(e) It is also found that each workday when Mr. Mc-Crady was assigned to duty at Building SA-16 in Bosslyn, he was required to spend (in addition to the amounts of time allowed for getting into and out of his uniform, and drawing 'and returning his gun) 2 minutes to walk between his locker and gun point; and 1 minute to telephone company headquarters (he merely called in and did not have to get instructions), or a total of 12 minutes preshift overtime; that at the end of his shift, he was required to spend identical amounts of time performing these same activities in reverse, except that he did not have to call headquarters, which reduced his postshift overtime to 11 minutes; and, thus, his preshift, and postshift, overtime totalled 23 minutes per shift.
(f) Mr. McCrady was never given a regular lunch break, and he ate his lunch on post while performing his regular duties.
53. (a) Plaintiff Edward T. Price was employed on the guard force from October 14,1963 throughout the remainder of the claim period. During his employment he was a member of Company A, First Battalion; assigned to duty on *443rotation at various posts in tbe Pentagon; used a locker located in the eighth corridor on the main floor of that building until about September 1965, and, thereafter, one located in the Concourse locker area; and assigned to a gun point situated in the third floor guard office.
(b) It is found that the preshift, and postshift, overtime performed by Mr. Price each day was the same when his locker was in the eighth corridor and the Concourse area; that he spent 7 minutes getting into his uniform and the same amount of time changing back into civilian clothes; that (in addition to the time required to change clothes) it took him, on the average, 3 minutes to walk from his locker to the gun point; 3 minutes to draw his gun; and 4 minutes walking from the gun point to his various posts, or a total of 17 minutes overtime to perform required preshift activities ; that, at the end of his shift, he spent the identical amounts of time performing these same aforestated activities in reverse, except that Mr. Price usually was near the gun point at the end of his scheduled shift, so no overtime was spent or claimed by him for time spent walking back to the gun point; and, therefore, the postshift overtime performed by this plaintiff amounts to 13 minutes, or a total of 30 minutes overtime per shift.
(c) Mr. Price was given a 30-minute lunch break each workday and allowed to eat in the cafeteria.
54. (a) Plaintiff Leroy A. Perkins, throughout the entire claim period, was assigned to Company D, 'Second Battalion, which later was redesignated the Third Battalion; and his locker was located on the third floor, and his gun point on the main floor, of the Central Intelligence Agency (CIA), South Building, at 2430 E Street, N.W., Washington, D.C.
(b) Mr. Perkins was a “swing” man and worked 50 percent of the time at either the Selective Service Building at 17th and F Streets, N.W., or a building at 1750 Pennsylvania Avenue, N.W., both of which locations were 6 blocks distant from the gun point and required 10 minutes walking time; 25 percent of the time at the Interior Building, which was located 4 blocks distant from the gun point and required 7 minutes walking time; 15 percent of the time at the Civil Service Commission Building, which was 3 blocks distant *444from tbe gun point and required 4 minutes walking time; and a State Department Building at 2210 E Street, N.W., which was 2 blocks distant from the gun point and required 2 minutes walking time.
(c) It is found that Mr. Perkins was required to spend equal amounts of overtime in performing all preshift, and postshift, activities at all times he was assigned to the same post; that he was required to spend identical amounts of overtime at the times he was assigned to various posts, with the exception of the time required to walk between his gun point and post which depended upon the location of the particular post, i.e., each workday he spent 20 minutes getting into his uniform and changing back to civilian clothes, 4 minutes walking between his locker and gun point, and 6 minutes drawing and returning his gun, or a total of 30 minutes per shift; that in addition thereto, he was required to spend varying amounts of overtime walking between his gun point and post (see (b), above); and, therefore, the total amount of overtime performed by him per shift during the claim period was 50 minutes, 50 percent of the time; 44 minutes, 25 percent of the time; 38 minutes, 15 percent of the time; and 34 minutes, 10 percent of the time.
(d) Mr. Perkins did not receive a regularly scheduled lunch hour. He walked roving patrols and ate lunch at his desk during a 15-minute period he spent there between patrols. While at the desk, he had to open the door to let people in and out, and to monitor the telephone. On the average, he took about 25 minutes during his shift to eat.
55. (a) Plaintiff Calvin H. Bay was employed on the guard force from August 5,1963 through the end of the claim period. During this entire period of time, he was assigned to Company L, Third Battalion; he worked the third relief, i.e., from 4 p.m. to 12 p.m.; and his locker was in the GAO Building on G Street, N.W., Washington, D.C.
(b) Mr. Ray’s gun points were located at several different places, including the GAO, HOLC, SEC North, and SEC South Buildings, and the U.S. Courthouse, depending upon where he was assigned to duty. He was assigned for varying periods of time, undisclosed by the record, to a number of posts, including not only the buildings mentioned above but *445also tlie Columbia Building near the GAO; a building housing the Court of Military Appeals and the Induction Center located across from the U.S. Courthouse; the Immigration Service at 3rd and D Streets, N.E.; a Government warehouse at 15th and West Virginia Avenue, N.E.; at the Treasury School on 12th Street, N.W.; and a building at 1321 H Street, N.W., all of which posts were located in Washington, D.C., at varying distances from the GAO Building.
(c) It is found that Mr. Bay was required to spend equal amounts of overtime hr performing all preshift, and post-shift, activities at all times he was assigned to the same gun point and post (as well as to the locker in the GAO Building) ; that he was required to spend identical amounts of overtime at the times he ivas assigned to various posts, with the exception of the time required to travel between his locker and gun point, and between his gun point and post, which depended upon the location of the particular gun point and post involved; i.e., each workday throughout the entire period of his employment, he spent 10 minutes getting into his uniform and changing back into his civilian clothes, and 2 minutes drawing and returning his gun, or a total of 12 minutes per shift;
(1) That when his gun point was in the GAO Building, it always took him 2 minutes to travel each way between the locker and gun point; and no time to get from the gun point to the post because they were immediately adjacent to each other, so the total preshift and postshift overtime performed by him amounted to 18 minutes per shift; that when his gun point was in the GAO Building and his post was at the Columbia Building nearby, it took him 4 minutes to walk between the gun point and post, so the total preshift and postshift overtime performed by him amounted to 24 minutes ; that when his gun point was in the GAO Building and he was assigned to the building housing the Court of Military Appeals and Induction Center, it took him 5 minutes to walk between the gun point and post, so the total preshift and postshift overtime performed by him amounted' to 26 minutes per shift; that when his gun point was at the GAO Building and his post at 1321 H Street, N.W., it took him 30 minutes to walk between the gun point and post, so the total *446preshift and postshift overtime performed by him amounted to 76 minutes per shift; that when his gun point was at the GAO Building and he was assigned to the Treasury School, it took him 25 minutes to travel between the gun point and post, so the total preshift and postshift overtime performed by bim amounted to 66 minutes per shift;
(2) That when his gun point and post were at the U.S. Courthouse, it took him 10 minutes to travel between the locker and gun point, so the total preshift, and postshift, overtime performed by him amounted to 32 minutes per shift;
(3) That when his gun point and post were at the SEC North Building, it took him 7 minutes to walk between the locker and gun point and no time to get to his post, so the total preshift and postshift overtime performed by him amounted to 26 minutes per shift; that when his gun point was in the SEC North Building and his post was at the SEC South Building, it took him an additional 2 minutes to walk between the gun point and post, so the total preshift and postshift overtime performed by him amounted to 30 minutes per shift;
(4) That when his gun point was in the HOLC Building and his post was at that building, it took him 10 minutes to walk between the locker and post, so the total preshift, and postshift, overtime performed by him amounted to 32 minutes per shift; that when his gun point was at HOLC and 'his post was at the SEC South Building, it took him an additional 2 minutes to walk between the gun point and post, so the total preshift and postshift overtime performed by him amounted to 36 minutes per shift; that when his gun point was at the HOLC and his post was at the SEC North Building, it took him still another additional 2 minutes to walk between the gun point and post, so the total preshift, and postshift, overtime performed by him amounted to 40 minutes per shift; that when his gun point was at the HOLC and his post was at the Immigration Service Building, it took bim 12 minutes to walk between the gun point and post, so his total preshift and postshift overtime amounted to 56 minutes per shift;
( 5) That when his gun point and post were at the Government warehouse, it took him 20 minutes to travel (by auto*447mobile — a guard was not assigned there without a oar) between the locker and post, so the total preshift, and postshift, overtime performed by him amounted to 52 minutes per shift.
(6) Mr. Ray was unable to recall (with certain exceptions) any posts where he served more often than the others; however, he stated that he was assigned to the post at the GAO Building much less than at the other ones mentioned herein (except 1321 H Street, N.W., and the Treasury School). As to the post at 1321H Street, N.W., it appears that he served there less frequently than at any of the other posts (with the possible exception of the post at the Treasury School). With respect to the post at the Treasury School, Mr. Ray stated on direct examination that he “walked” thereto because there were no parking areas in that vicinity; however, on cross-examination, he testified that he had an automobile from August 1963 until about February or March 1965, when he disposed of it, and that during this period of time he drove to said post, the driving time not being disclosed by the record; that after disposing of his car (and presumably walked bo the post), his assignments to this post were limited to “maybe one a month, and maybe less than that.”
(d) Mr. Ray never received a regular lunch break of 30 consecutive minutes. He usually ate while on duty at his post. Sometimes, when he was required to make a roving patrol, he ate while patrolling. He took no more than 5 minutes to eat. He was never relieved during his shift and received no “free time” during his shift when he was not actually on duty.
56. (a) Plaintiff Robert R. Reaves, throughout the entire claim period, was regularly employed as a member of the guard force; assigned to Company B, First Battalion; worked the first relief, i.e., from 12 p.m. to 8 a.m.; had a locker in Building T-7, Gravelly Point, near the National Airport; and was assigned to duty and had a gun point at the Highland Building on Columbia Pike, which housed the Army Research Office, a 5.2-mile drive from Gravelly Point, all in Arlington County, Virginia. (A few times — 3 or 4 — during the claim period, he was assigned to duty at a Government building in Franconia, Virginia.)
(b) It is concluded that the amounts of time that Mr. *448Heaves claimed were required of him to perform certain pre-shift, and postshift, activities are excessive; and that no time should be allowed for either the time, originally claimed but apparently abandoned, that he assertedly spent driving from his home to T-7 Building at Gravelly Point, or the time he claimed he spent walking between the entrance to said building and the locker therein. No time is being allowed this plaintiff for drawing and returning his gun since there is no testimony or other evidence concerning this activity, nor is any overtime specifically claimed with respect thereto, and it is reasonably assumed that he obtained his gun on post, rather than at a different location some distance away therefrom. It is found that each workday it took Mr. Heaves, on the average, 10 minutes to get into his uniform; and 15 minutes to walk from his locker to his car, drive from T-7 Building to the Highland Building, and walk from his car to, and assume, his duty post therein; so he was required to spend a total of 25 minutes overtime performing preshift activities; and that at the end of his shift, it took him, on the average, 25 minutes to walk from the post to his car, drive back to T-7 Building and walk from his car to the locker therein, and 10 minutes to change back into his civilian clothes; so he was required to spend a total of 35 minutes overtime performing postshift activities, or a total of 1 hour preshiffc, and post-shift, overtime per shift.
(e) Mr. Heaves was not given a regular lunch period and ate on his post while performing regular guard duty assignments.
57. (a) Plaintiff Gordon E. Shaffer was employed as a guard during the entire claim period. He was a member of Company H, Third Battalion, from April 1961 through 1963, and Company D, Second Battalion, from 1963 to the end of the claim period.
(b) During a period from 1961-1962 (dates not disclosed by the record), Mr. Shaffer’s locker and gun point were in the North Health, Education, and Welfare (HEW) Building at 4th and C Streets, S.W., Washington, D.C.; and it took him 2 minutes to walk between the locker and gun point. He was assigned to duty at various locations, including one just outside the North HEW Building, which was a 1-minute *449walk from fclie guu point; Tempos (temporary buildings) A, B, and C; and the old Providence Hospital, all of which were a 10-minute walk from the gun .point; the National Aeronautical and Space Agency (NASA) Building, which was a 3-minute walk from the gun point; and a building at Suitland, Maryland, to which he necessarily drove, a one-way trip taking 15 minutes.
(c) During a period from 1962 to 1963 (dates not disclosed by the record), Mr. Shaker’s locker and gun point were in Building 213 at the Navy Yard, Washington, D.C.; it took him 2 minutes to walk between the locker and gun point; and he was assigned to duty at a post in the lobby which was so close to the gun point that no significant amount of time was required to walk between the gun point and post.
(d) During a period from 1963 to the end of the claim period, Mr. Shafer’s locker and gun point were located in the CIA South Building at 2430 E Street, N.W.; it took him 2 minutes to walk between the locker and gun post; and he was assigned to duty at a desk post, which was where he drew his gun.
(e) It is found that throughout the entire claim period, Mr. Shafer was required to spend equal amounts of overtime in performing all preshift, and postshift, activities at all times he was assigned to the same post; that he was required to spend identical amounts of overtime at all of the times he was assigned to various posts, with the exception of the time required to walk between his gun point and posts during the 1961-1962 period, which depended upon the location of the particular post, i.e., each workday he spent a total of 20 minutes getting into his uniform and changing back into civilian clothes; 4 minutes to walk between his assigned locker and post; and 6 minutes to draw and return his gun, or a total of 30 minutes per shift.
(f) It is further found that during the 1961-1962 period, the overtime required of Mr. Shaffer to perform pre-shift and postshift activities totalled 32 minutes per shift, when he was assigned to a post just outside of the HEW Building; 50 minutes per shift, when he was assigned to a post in Tempos A, B, and C, or the old Providence Hospital Building; 36 minutes per shift, when he was assigned to a *450post at NASA; and 60 minutes per shift, when he was assigned to a duty post at Suitland, Maryland.
(g) It is further found that throughout the entire 1962-1966 period of this employment, both when he was assigned to duty at a post in Building 213 at the Navy Yard (1962-1963), and a post in the CIA South Building (1963-1966), the overtime required of Mr. Shaffer to perform preshift, and postshift, activities totalled 30 minutes per shift.
(h) During the 1961-1962 period, Mr. Shaffer was not relieved for a lunch period and he did not have a regular lunch break. He took about 10 minutes each day to eat on post when he found an opportunity to do so. He did not complain about not being allowed a regular amount of time to eat because he understood when he was first employed that he was not to be given a lunch period. During the 1962-1963, and 1963-1966, periods, he took about 5 minutes each day to eat. The only time he was relieved from his post was when he requested a relief to go to the bathroom, and he returned to his post immediately thereafter.
58. (a) Plaintiff Calvin Leroy Smith was employed as a guard from sometime in April 1965 until the end of the claim period, and he was a member of Company D, Third Battalion. Most of the period he worked the third relief, i.e., from 4 p.m. to 12 p.m., but at times he was on the second relief, i.e., from 8 a.m. to 4 p.m.
(b) Mr. Smith’s locker was located in the basement of the GSA Building, Washington, D.C., and his gun point was on the first floor of that building. He was assigned to posts at 1776 Pennsylvania Avenue, 1724 and 1729 New York Avenue, and 1800 G Street, all N.W., Washington, D.C., and looated approximately 3 blocks distant from his gun point.
(c) It is found that each workday it took Mr. Smith 10 minutes to get into his uniform, 3 minutes to walk from the locker to the gun point, 3 minutes to draw his gun, and, on the average, 10 minutes to walk the 3 blocks to each of his various posts, amounting to 26 minutes of overtime required to perform necessary preshift activities; that at the end of his shift he spent identical amounts of time in performing these same activities in reverse, except that it *451took him only 8 minutes to change back into his civilian clothes, so he was required to spend 24 minutes overtime in performing postshift activities; and, therefore, his preshift, and postshift, overtime totalled 50 minutes per shift.
(d) Mr. Smith was not given a regular lunch period of 30 consecutive minutes. He usually ate at his desk on post whenever he could find time to do so. Since he was still on duty while eating, his lunch was interrupted whenever other things came up that had to be done, such as answering telephone calls and checking persons entering and leaving the building.
59. (a) Plaintiff William D. Tapscott, now a lieutenant on the guard force, was a private on the force at the beginning of the claim period in April 1961, and he was regularly employed throughout said period. He was a member of what was known as the Yets Group, which later became Company I, Second Battalion, from April 1961 to February 18, 1962, when he was promoted to sergeant and transferred to Company E, Second Battalion (presently known as Company D).
(b) During the period from April 1961 to February 18, 1962, Mr. Tapscott worked the second relief, i.e., from 8 a.m. to 4 p.m.; his locker was on the fourth floor of a building located at 1717 PI Street, N.W., Washington, D.C.; and he was assigned to various posts in that building. It is concluded that the testimony presented by this witness as to some of the things he did and the time spent doing the same is incredible, and that the amounts of overtime claimed by this plaintiff in performing most of the preshift, and postshift, activities involved are excessive. The time assertedly spent walking from the entrance of the building to the locker is not allowed as overtime. It is found that it took him, on the average, 10 minutes to get into his uniform, 3 minutes to go from the locker to the particular post assigned to him on any given day, and 1 minute to obtain his gun from the guard he was relieving and checking the weapon, so he was required to spend a total of 13 minutes overtime in performing preshift activities; and that at the end of his shift, it took him 1 minute to pass on any special instructions to the guard assuming the post, and 2 minutes to walk from the post to the *452locker, so be was required to also spend a total of 13 minutes overtime performing postshift activities, or 26 minutes overtime per shift during this period.
(c) During the period from February 18, 1962 to October 14, 1962, Mr. Tapscott served as a sergeant in Company E, Second Battalion; 'his locker was in Temporary Building I, located between the Potomac Biver and the Beflecting Pool; and his gun point was in the guard office located next door to the locker room in that building; but his duty post was in the B & S Building, which was the gun point for the other guards in the company, located in a building back of Building I, all in Washington, D.C. He was on a rotating shift, alternating between the first, second, and third reliefs at 4-week intervals; and his duty post starting time was scheduled 30 minutes earlier than the other guards, since his supervisory duties as a sergeant included the responsibility for opening the gun point in the R «fe S Building and issuing weapons to the other guards, and he had to be ready for them. Similarly, his shift ended one-half hour earlier than the regular scheduled beginning hour of the shift. As an example of the inconsistency in the testimony of this witness, he stated that it took him 10 to 12 minutes to walk from his gun point to the gun point in the R «fe S Building, but that it took him 20 minutes to make the same walk back at the end of the shift. It is found that each workday during this period, Mr. Tapscott spent 10 minutes getting into his uniform, 3 minutes walking from the locker room next door and drawing his own gun, and 12 minutes walking from the gun point to his post at the R «fe S Building, so he was required to spend 25 minutes of overtime performing preshift activities; that at the end of his shift he was required to spend identical amounts of overtime performing these same activities in reverse, totaling 25 minutes; and, therefore, his preshift, and postshift, overtime totalled 50 minutes per shift.
(d) On October 14, 1962, Mr. Tapscott, still a sergeant, was reassigned to Company D, Second Batallion, later designated Company E, Second Battalion, and he served in this company during the remainder of the claim period. From said date until sometime in November 1965 (exact date not *453disclosed by the record), when he was promoted to lieutenant, Mr. Tapscott’s locker was located on the ground floor of the State Department Building at 21st Street and Virginia Avenue, N.W.; he was assigned to the second relief, i.e., from 8 a.m. to 4 p.m.; his gun point was in the guard office near the locker room; and he was regularly assigned most of the time to a duty post at the West Court of the General Services Administration, 18th and F Streets, N.W., all in Washington, D.C. It is found that during this period it took Mr. Tapscott 10 minutes to get into his uniform, 3 minutes to walk to his gun point nearby and draw his gun, and 12 minutes to walk to his post, amounting to a total of 25 minutes overtime he was required to spend in performing preshift activities; that at the end of his shift, he was required to spend identical amounts of overtime performing these same activities in reverse, amounting to another 25 minutes in postshift overtime; and, therefore, he was required to perform a total of 50 minutes overtime per shift.
(e) After attaining the rank of lieutenant sometime in November 1965, throughout the remainder of the claim period, Mr. Tapscott continued to serve in Company D, and to use a locker and gun point in the main State Department Building. As best it can be determined from a confused record, most of the time his shift (and those of other lieutenants) was scheduled 1 hour before the time the other guards reported in, i.e., from 7 a.m. to 3 p.m., 3 p.m. to 11 p.m., and 11 p.m. to 7 a.m., and his shift was supposed to be rotated every 4 weeks, but primarily he worked the 7 a.m. to 3 p.m. shift, though for an indefinite and apparently short part of the claim period, the starting and ending times of his, and other lieutenants’, shifts coincided with the shifts of the other guards, i.e., 12 p.m. to 8 a.m., 8 a.m. to 4 p.m., and 4 p.m. to 12 p.m. Testimony was presented by Mr. Tapscott that in accordance with the provision of Section 206(c) of the 1952 issue of the Handbook for Guards, quoted in finding 13(b) and mentioned in 13(e), he was required to come in prior to the beginning of his shift, e.g., before 7 a.m., sufficiently early to enable him to not only get into his uniform and draw his gun but also to go over the detail board to see who had called in sick and was absent, make necessary reas*454signments, etc., which assertedly took 10 to 15 minutes. Since the purpose of scheduling the shifts of Mr. Tapscott and other lieutenants 1 hour before the beginning of the shifts of the other guards apparently was to allow the lieutenants time to perform certain required supervisory duties, it is somewhat questionable that Mr. Tapscott had to do anything more prior to the beginning of his shift than get into his uniform and draw his gun. However, considering the officer early reporting regulation mentioned above and the fact that Mr. Tapscott’s testimony stands unrebutted, he is being given the benefit of the doubt in regard to this overtime function. Of course, it is easier to believe that it was necessary for him to report early in order to perform required supervisory duties, when his shift commenced at the same time as those of the other guards.
(f) It is found from the evidence that prior to the beginning of his scheduled shift each workday during November 1965 to the end of the claim period, Mr. Tapscott was required to spend 10 minutes getting into his uniform, 3 minutes walking to the nearby gun point and drawing his weapon, and 10 minutes performing certain supervisory duties, or a total of 25 minutes preshift overtime; that at the end of his shift, he was required to spend 10 minutes changing back into civilian clothes, and 2 minutes turning in his gun, or a total of 12 minutes postshift overtime; and, therefore, he was required to spend 37 minutes overtime per shift performing preshift and postshift activities.
(g) During the 1961-1962 period when Mr. Tapscott was assigned to duty at 1717 II Street, N.W., he was relieved about once a week so he could go to the locker room to eat lunch. However, he was still on duty status and his lunch was frequently interrupted by emergency calls. Most of the time during the entire claim period, he ate at his post when there was time to do so while performing his regular duties. Mr. Tapscott had no knowledge of guard supervisors below the rank of captain ever being given a regular designated lunch period.
60. (a) Plaintiff Melvin Lee Thomas was employed as a member of the guard force from July 2,1962 throughout the remainder of the claim period; he was assigned to Company *455F, Third Battalion, and he worked the first relief, i.e., the 12 p.m. to 8 a.m. shift.
(b) From July 2,1962 through 1964, Mr. Thomas’ locker was in the basement of the GAO Building at 441 G Street, N.W.; his gun point was in the guard office on the first floor of that building; and his duty post was about 25 blocks distant from the gun point at 1725 15th Street, N.W., all in Washington, D.C.
(c) It is concluded that the amounts of time claimed by Mr. Thomas to perform certain preshift, and postshift, activities are excessive; and it is found that each workday, it took him 10 minutes to get into his uniform, 2 minutes to walk from the locker to the gun point, 2 minutes to draw his gun, and 15 minutes to travel by automobile to his post, amounting to 29 minutes of overtime that he was required to spend in performing preshift activities; that at the end of his shift, it took him identical amounts of time to perform these same activities in reverse, except that due to rush-hour traffic conditions in the morning the driving time back to the GAO Building took 18 rather than 15 minutes, so he was required to spend 32 minutes overtime in performing postshift activities; and th'at, therefore, his preshift, and postshift, overtime totalled 61 minutes per shift.
(d)' From 1964 to the end of the claim period, Mr. Thomas continued to use a locker in the GAO Building. He was on a “swing” assignment and his posts were at several different locations. His primary duty posts were in the HOLC Building at 101 Indiana Avenue, and the Immigration and Naturalization Service Building at 119 D Street, N.E., Washington, D.O.; and his gun point was in the HOLC Building when he was assigned to duty at both of the above-mentioned buildings. The HOLO Building was located about 6 blocks distant from the GAO Building and the Immigration Building was located 4 blocks from the HOLC Building. Sometimes Mr. Thomas was assigned to the Pension Building located across from the GAO Building, and to the Columbia Building located about 4 blocks away from the GAO Building, in the 400 block of 4th Street, S.W., at which times his gun point was in the GAO Building. Other times he was assigned to the Mc-Shain Building located across from the TT.S. Courthouse, *456which was about 4 blocks distant from the GAO Building, and the place where his gun point was situated.
(e) Since Mr. Thomas was assigned to different posts and gun points located at varying places involving a wide range of distances and travel times, for varying periods of time undisclosed by the record, the best that can be done on the basis of the record is to average the overtime required of him to perform preshift and postshift activities. Therefore, it is found that each workday he was required, on the average, to spend 10 minutes getting into his uniform, 3 minutes to go from the locker to his gun point, 1 minute to draw his gun, and 4 minutes to travel from the gun point to the post, amounting to 18 minutes of preshift overtime; and he was required to spend, on the average, identical amounts of time in performing these same activities in reverse at the end of his shift, except that it took him 2 minutes to return his gun and 5 minutes to travel from his post back to the locker, amounting to 20 minutes of postshift overtime; and, therefore, he was required to spend a total of 38 minutes overtime per shift in performing preshift and postshift activities.
(f) During the entire claim period, Mr. Thomas was never given a regular 30-minute lunch period. He ate while on duty at his post and performing the guard work regularly assigned to him.
61. (a) Plaintiff John W. Thurmond, throughout the entire claim period, was regularly employed as a guard and assigned to Companies D, E, and F, all in the Second Battalion; his duties remained constant regardless of the company to which he was assigned; he worked the third relief, i.e., from 4 p.m. to 12 p.m.; his locker was upstairs in the West Court of the GSA Building at 19th and F Streets, N.W; his gun point was in the guard office on the first floor of that building; and he was assigned to a duty post in a building located at 1711 New York Avenue, all in Washington, D.O.
(b) It is found that each workday Mr. Thurmond spent 10 minutes changing into his uniform, 5 minutes walking from the locker to the gun point, 3 minutes drawing his weapon, and 10 minutes to walk from the gun point to the duty post, so he was required to spend a total of 28 minutes overtime performing preshift activities; that at the end of *457his shift, he spent identical amounts of time performing these same activities in reverse; and, therefore, he was required to spend a total of 56 minutes overtime per shift performing preshift, and postshift, activities.
(c) During the entire period of his employment, Mr. Thurmond did not have a regularly scheduled lunch period. He ate lunch on post at the guard desk at times he was not performing his regular guard duties, which included letting persons in and out of the building, and answering the telephone.
62. (a) Plaintiff Henry P. Wiley was regularly employed as a member of the guard force during the entire claim period. He was a private assigned to Company B, First Battalion, from April 1961 to September 12, 1965, when he was promoted to the rank of sergeant and reassigned to Company D, Second Battalion, which was subsequently re-designated Company E, First Battalion. He remained in this latter group through the balance of the claim period.
(b) During the period April 1961 to September 12, 1965, Mr. Wiley’s locker was at the Navy Annex on Columbia Pike, Arlington, Virginia. He worked the first relief, i.e., from 12 p.m. until 8 a.m., and was assigned almost exclusively to a duty post at the train gate to the premises of a building at Franconia, Virginia. (The same as plaintiffs Everett (see finding 36), Fox (see finding 38), and Kennerly (see finding 47)). Unlike the above-mentioned plaintiffs, Mr. Wiley drew and returned his weapon at a gun point at Franconia rather than exchanging guns on post. Mr. Wiley testified that sometimes on his days off during each week and also on occasions in inclement weather, he made a special request of the officer in charge to have his uniform placed in a box and transferred from the locker room in the Navy Annex to the building at Franconia in order to avoid the necessity of first going to the Navy Annex to change into his uniform before proceeding to his post; and that this occurred approximately 5 percent of the time, which enabled him to drive directly from his home to the duty post. He could have made such a special request more often than he did but this entailed calling in and a certain amount of trouble, so requests were made on a limited basis.
*458(c) (1) Mr. Wiley included in bis presbift overtime claim, tbe time be assertedly spent to walk from bis automobile in tbe parking lot. It is concluded that tbe amounts of time this plaintiff assertedly spent in performing certain presbift and postsbift activities are excessive, especially tbe times be claimed it took bim to drive tbe approximately 9 miles from the Navy Annex to Franconia late in the evening (20 minutes) and to drive back the next morning (45 minutes), and that no time should be allowed for the time taken by bim to walk from bis car in the parking lot to tbe locker in the Navy Annex. It is found that 95 percent of tbe time, before the beginning of bis shift, Mr. Wiley was required to spend 10 minutes getting into bis uniform, 15 minutes traveling from bis locker to tbe gun point at Franconia, 3 minutes to draw bis weapon, and 3 minutes to walk from tbe gun point to the post, amounting to 31 minutes overtime in performing pre-shift activities; that at tbe end of his shift, he was required to spend 3 minutes walking from bis post to the gun point, 3 minutes turning in bis weapon, 20 minutes to travel back to bis locker, and 10 minutes to change back mto civilian clothes, amounting to 36 minutes overtime in performing postsbift activities, or a total of 67 minutes overtime per shift.
(2) It is further found that 5 percent of the time, when Mr. Wiley drove directly from 'bis home to bis post of duty at Franconia, he was required to spend tbe same amount of overtime in performing presbift activities as be did during tbe other 95 percent of tbe time, less tbe 15 minutes time found and allowed bim for traveling from tbe Navy Annex to Franconia, or a total of 16 minutes presbift overtime; that at the end of bis shift, he was required to spend tbe identical amounts of overtime in performing tbe same postsbift activities mentioned in (c) (1) above, i.e., 36 minutes, or a total of 52 minutes per shift.
(d) From September 12, 1965, when be attained tbe rank of sergeant, through tbe remainder of the claim period, while serving in what was then designated as Company I), Mr. Wiley worked at various times on all three reliefs but mainly on tbe third relief, i.e., from 4 p.m. to 12 p.m.; however, his actual duty hours were scheduled 15 minutes before tbe begin*459ning liour of each, relief, i.e., 3:45 p.m. instead of 4 p.m. His looker and duty assignments were in the State Department Building. Mr. Wiley’s preshift and postshift overtime claim for this period was limited to the time he assertedly spent in changing into his uniform and re-dressing in civilian clothes. It is found that each day during this period the plaintiff was required to spend 10 minutes getting into his uniform and the same amount of time changing back into civilian clothes, or a total of 20 minutes preshift and postshift overtime per shift.
(e) Mr. Wiley, during the entire claim period, was never assigned a specific lunch period, and he ate at odd times when he had the opportunity to do so during the course of performing his regular guard duties.
63. (a) Plaintiff Edward Russell Wilson, throughout the entire claim period, was regularly employed as a guard, and assigned to the same company and battalion, although the designations thereof were changed at various times, i.e., Company E and Company F, Second Battalion, presently designated as the Third Battalion; he worked the third relief, i.e., from 4 p.m. to 12 p.m.; his locker was in the West Court of the GSA Building at 19th and F Streets, N.W.; his gun point was in the Interior Building located a block distant from the GSA Building; and he was assigned to a duty post at 1951 Constitution Avenue, located 1 block from the Interior Building, all in Washington, D.C.
(b) It is found that prior to the beginning of his shift each workday during the claim period, Mr. Wilson spent 10 minutes getting into his uniform, 5 minutes walking from the locker to the gun point, 3 minutes drawing his weapon, and 5 minutes walking to his duty post; so he was required to spend a total of 23 minutes overtime performing preshift activities; that at the end of his shift, he was required to spend identical amounts of overtime performing the same activities in reverse; and, that, therefore, his total preshift, and postshift, overtime totalled 46 minutes per shift.
(c) Mr. Wilson did not have a regularly scheduled lunch period, and he ate lunch at his desk during the 15-minute period intervening between the 45-minute patrols made by him each hour. His lunch was interrupted when he had to *460let persons in and out of the building and answer telephone calls.
64. (a) Plaintiff Ulrich Victor Woodfork, now holding the rank of inspector, was employed as a member of the guard force throughout the entire claim period. He was a sergeant assigned to Company E, Second Battalion, from the beginning of the claim period in April 1961 until September 2, 1961, when he was promoted to the rank of lieutenant and transferred to Company H, Third Battalion. He served as a lieutenant in the last mentioned company until the latter part of 1962, when he was transferred to Company E, Second Battalion, where he remained throughout the remainder of the claim period.
(b) During the period from April to September 2, 1961, when Mr. Woodfork was serving as a sergeant, he was assigned to a rotating shift; his locker was in Temporary Building I at 17th Street and Old Ash Drive, N.W., Washington, D.C.; he drew his gun himself at the gun point located in the guard office very near to the locker room; and his regular post of duty was in the guard office. The testimony presented by Mr. Woodfork relative to the overtime spent by him in performing preshift, and postshift, activities, particularly the former, is conflicting and not entirely clear. On the basis of such testimony and other evidence in the record, it is found that each day he had to arrive at his locker about 30 minutes before the beginning of Ms scheduled sliift; that he spent 10 minutes getting into Ms uniform and stepping into the nearby guard office where he was assigned to duty; 3 minutes drawmg and signing for Ms gun; and, on the average, 17 minutes maMng arrangements for replacements for guards who called M sick or failed to report for one reason or another, for transportation of guards to different posts, issuing guns to, and receiving them from, guards coming on, or going off, duty, and, about once a week, walking to some post to relieve the guard on duty there at the end of Ms shift until the regularly assigned, or a replacement, guard arrived at the post; therefore, he spent a total of 30 minutes overtime per shift in performing preshift activities. It is further found that at the end of his shift, this plaintiff spent 6 minutes changing *461back into his civilian clothes; and therefore, the preshift, and postshift, overtime required of him normally totalled 36 minutes per shift. It is also found that about once each week he was required to spend, on the average, 12 minutes at the end of his regular shift performing guard duty at one post or another, until a tardy guard or replacement arrived to take it over, and to walk back from such post to his locker; and, therefore, one day a week he was required to spend 18 minutes in performing postshift activities, or a total of 48 minutes preshift and postshift activities per shift.
(c) During the period from September 2,1961 to the latter part of 1962, as a lieutenant in Company H, Third Battalion, Mr. Woodfork was on a rotating shift assignment; his locker was in the North Building of the Health, Education, and Welfare (HEW) Department, Washington, D.C.; and his post of duty was in the main guard office in the HEW Building. According to Mr. Woodfork, he always tried to get to his locker about 30 minutes before the beginning of his scheduled shift. It is found that each workday during this period, this plaintiff was required to spend 10 minutes getting into his uniform, 5 minutes walking from the locker to the post, and 15 minutes drawing his gun and performing substantially the same kind of supervisory duties outlined in (b), above, or a total of 30 minutes overtime in performing preshift activities; that at the end of his shift, he was required to spend a total of 15 minutes turning in his gun, walking back to the locker, and changing into civilian clothes, or a total of 45 minutes overtime per shift in performing preshift, and postshift, activities.
(d) Throughout the period from late in 1962 to the end of the claim period, Mr. Woodfork served on rotating shifts as a lieutenant assigned to Company E, Second Battalion; his locker was located just off the main corridor of the main Navy Building at 18th Street and Constitution Avenue, N.W., Washington, D.C.; and his gun point was across the hall from the locker room in said building. Although, as noted in finding 20, supra, the 1963 revision of the Handbook for Guards, which was in effect during this period, did not contain a provision along the lines set forth in Subsection 206(C) of the 1952 issue of the Handbook (quoted in finding 13(b), *462supra), guard officers were still “expected” to come oil duty sufficiently early before the beginning of their scheduled shifts to enable them to perform certain supervisory functions. The unrebutted testimony shows that a Captain Athaide, Mr. Woodfork’s supervisor, required him to come in early to discharge his responsibilities and duties involving such functions.
(e) It is found that during this 1962-1966 period, Mr. Woodfork was required each day to spend 10 minutes getting into his uniform, 3 minutes to walk to his gun point and draw a weapon, and 15 minutes to perform supervisory-administrative duties as described in (b), above, or a total of 28 minutes overtime hi performing preshift activities; that at the end of his shift, he was required to spend 6 minutes changing back into his civilian clothes; and that, therefore, he was required to spend a total of 34 minutes overtime per shift performing preshift and postshift activities.
(f) During the entire claim period, Mr. Woodfork did not have a regularly scheduled lunch period. He ate his lunch whenever he could find time to do so while performing his regular duties as a sergeant or a lieutenant.
65. Credible testimony was presented at the trial by two nonplaintiff guard officers (now captains-commanders), namely, Mr. Sidney M. Wiggins, who was employed throughout the claim period, first as a sergeant and subsequently promoted to the rank of lieutenant in July 1962, and who was assigned to various companies and posts, including guard headquarters at the State Department Building, Navy Yard, and HEW Building, all in Washington, D.C.; and Mr. Vernon E. Partain, who was employed during the entire claim period, first as a lieutenant and subsequently promoted to the rank of captain in October 1963, and who also was assigned to various companies and posts, including guard headquarters in a building at 4th and C Streets, N.W., Washington, D.C., and the Pentagon, and Navy Annex on Columbia Pike in Virginia. Although these witnesses did not testify as to specific activities performed by named members of the guard force other than themselves, the testimony of both of these witnesses confirms the testimony presented by the plaintiffs in this case, and substantially supports the *463findings of fact hereinbefore set forth, to the effect that during the entire claim period the guard force regulations then in effect generally required all members of the force to perform certain activities, both before and after the end of their scheduled shifts, such as getting into their uniforms, changing back into civilian clothes, drawing and returning weapons, and traveling to and from their posts, and that the guards actually did these things on their own time.
66. During the part of the claim period from April 19, 1961 to January 1965, Mr. Charles C. Castella (identified in finding 11(a)) was the person who was authorized to order and approve overtime for the members of the GSA Guard Force. From January 1965 to January 1966, Mr. Harold Kyle, Chief of the Protection Branch, in addition to Mr. Castella, could order and approve overtime for guards. From January 1966 to the end of the claim period, i.e., February 28, 1966, only Mr. Kyle could authorize overtime for the guards. It should be noted that the foregoing and finding 11(a), supm, disclose that Mr. Castella was authorized to order and approve overtime not only during the part of the claim period from 1961 to 1963 when the 1963 revision of the handbook was issued, but also the period from 1963 to January 1966, during which time and thereafter throughout the remainder of the claim period the 1963 revision was in effect. Mr. Castella testified at the trial but Mr. Kyle was not called as a witness. Although defendant admitted that only Messrs. Castella and Kyle were the GSA officials authorized to order and approve overtime during the portions of the claim period stated above, the testimony of Mr. Castella shows that although guard captains generally were required to obtain prior approval from Mr. Castella or his office before they could authorize overtime for the guards under them, this requirement was quite liberally construed during the period from 1961 to 1965, and as a matter of actual practice there were times when overtime was performed by the guards under the direction of the guard captains, which overtime was subsequently approved by him (Castella) or his office; that beginning about 1965, the requirement that guard captains obtain advance approval from him prior to ordering guards to perform overtime work was more strictly enforced; but *464that at all times the restrictions on guard captains ordering overtime were waived whenever there was an emergency such as a breakdown of equipment or a fire.
67. (a) Mr. Castella, as Chief of the Buildings Management Division, GSA, was the top administrative official responsible for supervising all protection activities until 1965. While he did not personally directly participate in the operating activities of the guards, he had close administrative contacts daily with the Chief of the Protection Division in assuring that adequate guard service was being furnished. He was generally familiar with the provisions and regulations contained in the Handbook for Guards; the responsibilities, duties, and daily procedures of the members of the guard force working in the Washington, D.C., Metropolitan area; and had a reasonable knowledge of the buildings in the area to which the guards were assigned to duty.
(b) Mr. Castella was aware that historically the uniforms used by the guards were owned by the Government and kept in Government buildings where the guards were generally required under the regulations, until changed effective February 28,1966, to come in to work in time to put on their uniforms before reporting to their posts of duty, and to change back into civilian clothes after the end of their shifts; that guards would have to have a gun in their possession while on duty; that the weapons used by the guards could not be taken home by them and were closely controlled at points maintained at various places; that after getting into their uniforms, some guards had to travel from their lockers to gun points and draw a weapon and go on from there to duty posts before the beginning of their scheduled shifts; that in some cases the guards were assigned to buildings so far away from their lockers and gun points that the Government furnished them transportation unless, as a matter of preference rather than a requirement, they drove to the duty posts in their own automobiles, which travel was performed prior to the beginning of the scheduled shift; and that, logically, since posts had to be covered during the entire shift, the guards had to return to their gun points and/or lockers to turn in their guns and change back into civilian clothes after the end of their shifts.
*465(c) While Mr. Castell’a undoubtedly was aware of the fact that the members of the guard spent some time performing the aforementioned preshift and postshift activities required under the regulations, he never had a “time and motion study” made, nor knew of one having been made, to ascertain how much time was utilized by the guards in taking such actions nor did he ever ask or know how much time was actually involved. Considering the extent of Mr. Castella’s knowledge of the preshift and postshift activities generally required of the guards by the regulations, it is concluded and found that he must have been aware of the fact that they were actually required each day to perform, and actually did perform, substantial amounts of overtime both prior to, and at the end of, their scheduled shifts. Certainly, a man occupying the high position held by Mr. Castella over such an extended period of time, with his obvious intelligence and admitted general knowledge of the entire operation of the guard force, could not reasonably assume that the time spent by the guards in performing these required activities was insignificant, or ilde minimis” as contended by defendant.
(d) During the short period of time in 1966 (January-February) that Mr. Kyle was the only person generally authorized to order and approve overtime, he, as Chief of the Protection Division, was the person directly responsible for the day-to-day operations and activities of the guard force, and the regulations under which he discharged his duties were contained in the 1963 revision of the Handbook for Guards, which remained in effect until February 28, 1966, when he issued an order cancelling the existing rules and regulations relating to the use of uniforms so as to permit the guards to wear them to and from work each day.
68. Some of the members of the guard force complained about having to spend preshift, and postshift, overtime in performing activities required under the regulations, such as changing into uniform and traveling long distances to posts after coming to work, and not being paid therefor. These complaints were made orally to the sergeants and lieutenants who made the guard assignments, since the guards normally followed a chain of command and ordinarily would not go over the heads of their immediate superiors and directly *466complain to persons above the level of such supervisory personnel. It appears that for the most part, however, the guards accepted the fact that they had to do certain things without receiving overtime compensation and considered the situation as a part of the job.
69. The present contention that plaintiffs were being required to perform overtime work apparently was first conveyed in writing to GSA by a letter dated February 25,1965, addressed to the Regional Management Relations Officer, transmitting claims for overtime compensation submitted by a number of members of the GSA guard force, as evidenced by a letter dated April 8,1965, directed to Mr. J. P. Griner, National President, American Federation of Government Employees, Washington, D.C., by the GSA Regional Administrator, Region 3, denying these claims, which letter reads in pertinent part:
This is with further reference to your letter of February 25, 1965, * * * submitting claims for overtime compensation presented by * * * members of the GSA uniformed guard force.
Hi Hi ❖ H* %
Section 203 of the Federal Employees Pay Act Amendments of 1954, * * * authorizes the payment of overtime in addition to the basic compensation for all hours of employment “officially ordered or approved in excess of 40 hours in any administrative work week.”
Paragraphs 48 through 50 of the current Handbook for Guards, dated August 12, 1963 * * * establishes a regular tour of duty for guards consisting of eight straight hours, including a compensated lunch period not to exceed 30 minutes, at a time to be determined by their supervisors. Neither this handbook nor the preceding one, dated April 2,1952, requires guards to report for duty in advance of their scheduled tours of duty, although the earlier handbook did require guards to report to their assigned posts in uniform in time to relieve those guards whose tours of duty were ending.
H< H* Hi ❖ H«
Actually, the practice observed in Company * * * is the same as that in other companies, where no formal instructions to report early have been issued. In short, a “tacit expectation” exists throughout the GSA Guard Force that the guards will report in sufficient time to *467reach their posts in uniform, at the start of their tours of duty. To quote from Albright v. United States cited in your letter, “a ‘tacit expectation’ is not equivalent to the statutory requirement of ‘official order or approval.’ ” In this respect the guards are no different from other GSA employees, all of whom are expected to arrive at the building in which they are employed in time to be fully prepared to perform their duties at the appointed hour.
In view of the foregoing, since no overtime work was performed by any of the * * * claimants pursuant to official order or approval required by the Federal Employees Pay Act Amendments of 1954, their claims must be denied in their entirety.
70. Subsequent to the letter of April 8, 1965 (partially quoted in finding 69, supra), denying the claims presented to GSA, plaintiffs filed claims for overtime with the General Accounting Office, which were based on substantially the same contentions asserted in the instant claim; however, the claims were limited to 30 minutes per day, consisting of 15 minutes of preshift, and 15 minutes of postshift, activities. All of these claims were denied by a GAO Adjudicator-Authorizer who stated, among other things, in a letter dated December 7, 1965, to one of the claimants, as follows:
Paragraphs 48 through 50 of the current Handbook for Guards, dated August 12, 1963 (GSA Order PBS P 5930.1A) establishes a regular tour of duty for guards consisting of eight straight hours, including a compensated lunch period not to exceed 30 minutes, at a time to be determined by their supervisors. Neither this handbook nor the preceding one, dated April 2, 1952, requires guards to report for duty in advance of their scheduled tours of duty, although the earlier handbook did require guards to report to their assigned posts in uniform in time to relieve those guards whose tours of duty were ending.
$ ‡ $
The decision of the U.S. Court of Claims in the case of Mack N. Albright, et al. v. The United States, Ct. Cl. No. 263-61, and Robert B. Baker, et al. v. The United States, Ct. Cl. No. 323-61, both decided April 5, 1963, in which the plaintiffs received judgment for 15 minutes overtime a day for reporting to work prior to the beginning of each 8-hour tour of duty, was based on the fact *468that by regulations issued by the Security Office of the Norfolk Naval Shipyard the plaintiffs were required to report 15 minutes before their tour of duty began.
71. By letter dated March 11,1966, addressed to Mr. Griner (finding 69), the Acting Comptroller General of the United States, ref erring to a letter sent to GAO by Mr. Griner dated January 28, 1966, sustained the GAO adjudicator’s denial of plaintiffs’ claims in December 1965, stating in pertinent part:
Your general statement in support of your contention that guards working for Region 3 must work at least 30 minutes in excess of their eight-hour tour each workday is as follows:
“It is hereby again contended that during the periods involved in these claims, it is required by verbal and written authority that these Guards, members of the Special Police Force, are required to report for duty far enough in advance of the official starting time to dress in uniform, draw weapons and equipment, receive an assignment and report for duty. In many instances their duty post to which they must report is many blocks away from the original starting point. The reverse of this procedure occurs at the close of the tour of duty. They must wait at their posts until relieved by the oncoming Guard of the succeeding shift and then turn in their weapons and uniforms, etc. at points often blocks away. This extra time required of them totals thirty (30) minutes or more each day. They are not compensated for this overtime duty. It is also contended that it is required that these members of the Special Police Force be in full uniform equipped with revolvers and badges and are not authorized to take such uniforms or equipment from the premises.
tfc ❖ # * *
You have furnished no order or regulation which specifically requires the claimant guards to report before the beginning of their tours of duty.
The letter to you from the Regional Administrator, Region 3, General Services Administration, dated April 8,1965, which you enclosed with your letter to our Office of November 2,1965, indicates that working conditions varied between the different units of the guard force to which the claimants are assigned; * * * and that there were no specific early reporting requirements in force for guards employed w Region 3. We must accept *469the facts as reported by the Government agency concerned when such facte do not agree with the facts alleged by the claimant unless the claimant furnishes evidence which clearly shows the facte submitted by the Government agency to be in error. The evidence you have presented does not show the facts as reported by the General Services Administration to be in error; therefore, the determination of the Claims Division must be sustained.
* * * [T]he guards in Region 3 are not required to report at any specific time in advance of the beginning of their shifts but are merely required to be ready to assume their guard duties on time. * * *
72. The evidence does not establish that any written order or directive was issued by GSA requiring the members of the guard to report for duty any specific amoimt of time prior to the beginning of their scheduled 8-hour shifts, nor that anyone with authority to order or approve overtime specifically ordered any of the plaintiffs to report a certain period in advance of their tours of duty; however, the practical effect of the guard force rules and regulations concerning the wearing of uniforms and the issuance of weapons was to require plaintiffs to report early in order to put on their uniforms and make themselves presentable for duty, obtain their weapons, and travel to their assigned posts; and, of course, these requirements meant that the same things had to be done in reverse at the end of their shifts.
73. Despite the fact that members of the guard force knew that the force’s regulations prohibiting the wearing of uniforms off Government premises was a condition of their employment, and that no additional compensation would be paid to them for time spent in changing into and out of uniforms, some of them did complain to their immediate supervisors about the overtime required of them to comply with this and other regulations. Furthermore, the testimony suggests that if a guard continuously made complaints, efforts were made to replace him, and this fact undoubtedly served as a deterrent to the guards’ complaining since they understandably did not want to face possible discharge.
74. It is concluded and found from the evidence that plaintiffs who testified discharged their burden of establishing *470that they performed preshift, and postshift, overtime with the knowledge, encouragement, and/or inducement of properly authorized GS A officials.
75. The evidence shows that only a very few of the plaintiffs consistently received regular lunch breaks of 30 minutes each workday, or other free time, when they were not on duty, and that they either ate while actually performing regular assigned guard duties and/or were subject to call at all times during their shifts. Therefore, it is found that defendant has failed to carry its burden of proof that the amounts of time spent by some guards in eating or resting at their regularly assigned posts of duty were taken under such circumstances as would entitle defendant to offset such times against the overtime performed by them.
With respect to those guards who were permitted to, and actually did, take off-duty-post lunch breaks, such breaks are not compensable and are offsettable against overtime found compensable in this case. Such guards are plaintiffs Bell (2); Dickens (7); Fitch (14) ; Harris (19); Hoover (24); and Price (36).
76. As to the plaintiffs still in this case who did not appear and testify, all of the material and relevant facts concerning them set forth in the Preliminary Statement immediately preceding the preceding numbered findings of fact herein are hereby incorporated in this finding by reference in order to avoid unnecessary repetition and the facts in said Statement should be considered supplementary to those contained in finding 29 (a), (b), and n. 4, as well as to the instant finding.
In Paragraph 1 of defendant’s answer, it substantially admits the allegations in Paragraph 1 of plaintiffs’ petition in words which (for convenient reference) are quoted in pertinent part:
Admits that during all or part of the claim period, plaintiffs [including the plaintiffs who did not testify] were civilian guards employed by the General Services Administration, Washington, D.C.; that they were assigned guard duties at various Government buildings or installations located in or near Washington, D.C.; and that they are or were classified Civil Service employees of the United States. * * *
*471Considering the 'above-quoted portion of defendant’s answer, and all the evidence in the record, there can be no serious question but that all of the 14 plaintiffs who did not testify actually performed some amounts of overtime engaging in preshift, and postshift, activities similar to those which the plaintiffs who testified carried out. However, despite the foregoing, it should be noted and emphasized that there is no evidence in the record concerning the location of the lockers, gun points, and posts of these 14 plaintiffs, nor any evidence showing the specific amounts of time spent by them in performing preshift and postshift activities. Accordingly, this record will not support findings that these 14 plaintiffs actually performed certain amounts of overtime.
Furthermore, as previously mentioned in said Preliminary Statement, the letters by plaintiffs’ attorney to six of these 14 plaintiffs were returned to the sender with the envelopes marked “Address Unknown.” It may be reasonably assumed that plaintiffs’ attorney sent the letters to these six plaintiffs at their last known addresses; and, therefore, it is apparent that none of them kept their attorney apprised of their current address or whereabouts. Since the letters sent by plaintiffs’ attorney to the other eight plaintiffs who failed to appear and testify apparently were not returned to the sender, it may be reasonably assumed that these letters were delivered to the addressees and that they simply ignored the letters. In any event, the aforestated facts and circumstances indicate that all 14 of these plaintiffs have actually or constructively abandoned their claims; and it is found that they have failed to prosecute their claims and to discharge the burden of proving the same. Therefore, and further considering the ground rules under which this case was tried, it is concluded and found that the claims of the 14 plaintiffs who did not testify must be denied for want of prosecution 'and failure of proof, and that the petition a)s to them should be dismissed.
In summary, the plaintiffs who appeared and testified are entitled to be compensated for the overtime respectively performed by them, subject to offset where applicable, as set forth in the separate findings of fact found herein relating to these plaintiffs with the amount of recovery to be determined in further proceedings pursuant to Rule 131(c); but the *472plaintiffs who did not appear and testify are not entitled to recover and the petition should be dismissed as to them.
CONCLUSION' op Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that all of the plaintiffs still in the case, except Hugh T. Brown (3), Joe Allen Brown (4), Moses Brooks, Jr. (5), Joseph O. Donley (9), Homer Ellison (10), Kobert T. Eilertson (11), Albert T. Fells (13), Harrison W. Gabnel (16), Walter Haynes (20), Herbert A. Hoff (22), Martin S. Mitchell (31), Alexis T. Nogero (36), William B. Shephard (41), and Willie C. Watson (46), are entitled to recover, subject to offset where applicable, and judgment is entered to that effect, with the amount of recovery as to each plaintiff entitled to recover to be determined in future proceedings under Bule 131(c) in accordance with this opinion.
The court further concludes as a matter of law that the last above-named plaintiffs are not entitled to recover, and the petition as to them is dismissed.

While the petition does not limit the claim period to less than 6 years prior to the filing thereof, plaintiffs’ attorney agreed and stipulated on the record during the trial session held on March 5, 1970, that the claim period involved herein extends only from April 19, 1961 to February 28, 1966, the effective date of a change in existing regulations rvhich generally prohibited members of the GSA Guard Force from wearing their uniforms to and from work, or outside the limits of their respective official duty areas. (See finding 14 infra, for further details.) In this connection, plaintiffs incorrectly indicated in a footnote to their requested finding 2 that 6 U.S.C. § 911 is the same as 5 U.S.C. § 5542. The latter was enacted by the Congress effective September 6, 1966; and if states the overtime law as of the amendment effective July 18, 1966, Pub. L. No. 89-504, Title IV, Section 404(a) (1), 80 Stat. 297. Since the effective date of said amendment is outside the stipulated claim period, the relevant statutory provision in effect during the claim period is properly and correctly cited as 5 U.S.C. § 911 (1964).

See defendant’s answer to the petition, par. 10, in which defendant states a “counterclaim and/or offset,” alleging, in summary, that plaintiffs were authorized to take a 30-minuts lunch period during each shift throughout the claim period involved here; and that although plaintiffs were not required to perform any substantial duties for the united States during such lunch periods, they each received compensation therefor at the prevailing regular hourly rate. Defendant states that it does not seek an affirmative money judgment against plaintiffs on the basis of such alleged paid, duty free lunch periods. The answer contains no reference to “other free time” which is mentioned by defendant for the first time in this proceeding in its requested finding 2.

Although the language of the two handbooks relating to certain subject matters differs to some extent, the substance and effect thereof is essentially the same; therefore, in the interest of brevity and convenient reference, both handbooks will be referred to as the “Handbook for Guards” or the “Handbook,” unless it is material and relevant to specify the particular version involved.

It was clearly understood by the parties and the commissioner that each plaintiff would have to stand on, and be bound by, his own proof; that separate findings would be made as to each plaintiff with respect to the time it necessarily took him to perform the various preshift or postshift activities required of him by the work rules and regulations issued by GSA; and the total overtime, *407if any, he worked for which he was entitled to compensation. Plaintiffs submitted a complete set of requested findings, including separate findings with respect to each of the 33 plaintiffs who testified but not as to the 14 plaintiffs who did not appear at the trial. The defendant submitted a set of requested findings which did not include separate findings as to each plaintiff, and expressed general and/or specific objections to the findings requested by the plaintiffs.

The above-stated times allowed for changing Into and out of uniforms Include the time undoubtedly required at one time or another each day for the plaintiffs to perform various other miscellaneous activities as to which no testimony was presented or specific amount of time claimed, such as maintaining their lockers in a neat and orderly condition and standing inspections.

While it would appear from some of the testimony that it actually took less time for some of the plaintiffs to change back into civilian clothes than to get into their uniforms and make themselves presentable, and for them to return their weapons than to draw the same, the evidence considered as a whole will not support findings that would reduce the maximum time allowed for any of these activities. It should be mentioned that insofar as it is suggested that it took less time to change clothes during the summer than in the winter, this factor was considered in arriving at the maximum average time allowable to any one plaintiff per shift each workday.

Obviously, this will result in some of the plaintiffs being allowed less time than others for performing these same activities. While this may appear to be unfair, it must be kept in mind that some plaintiffs will be allowed much less time than they testified was required by them to perform certain functions; and that the ground rules under which the case was tried make it impossible to allow any plaintiff more time for taking certain actions than he testified was actually required.
In an effort to shorten, minimize repetitive language, and simplify the separate findings that follow concerning each plaintiff, as much as possible, the said maximum time allowances determined reasonable for each of these stated preshift and postshift activities will be included, where applicable, in said findings without further discussion or explanation. In those instances where a plaintiff testified that it took him less time to perform one of the above-mentioned activities than the maximum time allowed with respect thereto, his testimony as to the time required is being accepted as credible and reasonable. Such amounts of time will be set forth in the separate finding made covering the particular situation of each plaintiff without discussion of the testimony or any other evidence in the record relating to the activity involved, and included in the total time found to have been required by each plaintiff in performing all preshift and postshift functions.

As previously mentioned (finding 26(b)), the total time actually taken by a majority of the guards to perform required preshift activities was more than the total time spent by them in postshift activities, and defendant, in effect, concedes that one of the reasons causing this result was that the guards had to report to their posts a little early prior to the commencement of the scheduled shift in order to familiarize themselves with the special orders applicable to the post and to receive from the guard being relieved any special instructions that the latter might need to pass on. On the basis of the foregoing, since most of the plaintiffs claimed that they spent as much or more postshift time returning to their gun points or lockers as they spent proceeding to their posts, the defendant inferentially suggests that the postshift travel times claimed by such plaintiffs are inflated and should be reduced. The evidence will not support any such inference or finding. Although plaintiffs have contended that they were required under the regulations to report to their posts early, the statement is simply made in the separate findings requested as to each plaintiff who testified that It “took” (or some similar word such as “required”) him a certain number of minutes to “proceed” (or some similar word such as “travel” or “get”) to his post from his locker room, or from his gun point if he did not obtain his gun on post, and no amount of time is claimed for reporting to his post early. Accordingly, it is apparent that plaintiffs *411have abandoned and waived their claims for overtime arising out of the “early reporting” directive issued by GSA. Any conclusion contrary to those stated above would result in an absurd situation. For example, one plaintiff claimed it “toot" him only 1 minute to proceed from his locter to his post, and he included only this amount of time with respect to preshift travel between these points. Obviously, he did not claim any time for “early reporting.”

No part of the time claimed by this plaintiff for travel between the entrance to the Navy Annex and his locker located therein is allowed. The total overtime found as to this plaintiff is less than that for plaintiff Hverett because most of the time the latter was assigned to more distant posts (finding 36(b)).

It is suspected that during this period Mr. Harris was able to return to his locker, change back into his civilian clothes, and be ready to turn in his gun and equipment promptly at the end of his scheduled shift, and leave as soon as he had done so (the same as plaintiff Fitch — finding 37(c)) ; however, this is not established by the evidence in the record.

The last three sentences of this finding, particularly the last 2, are applicable to a number of other plaintiffs, which explains why the findings as to such plaintiffs are not always broken down to show the amounts of time required to perform each preshift, and postshift, aetivity involyed, and simply state in summary form the total overtime found to have been performed.